770 N.E.2d 1160 (2002)
331 Ill. App.3d 220
264 Ill.Dec. 464
In re Interest of J.P. and T.P., minors, Respondents-Appellees (The People of the State of Illinois, Petitioner-Appellee,
v.
Catherine P. and Thomas P., Respondents-Appellants).
Nos. 1-99-4165, 1-99-4405.
Appellate Court of Illinois, First District, First Division.
May 20, 2002.
*1162 Thomas J. Esler, Skokie, for appellant Chatherine P.
Rhonda L. Casady, Chicago, for Thomas P.
Richard A. Devine, State's Attorney, Chicago (Renee Goldfarb, Kenneth T. McCurry, and Jennifer Streeter, Assistant State's Attorneys, of counsel), for the People.
Patrick T. Murphy, Public Guardian, Ron Fritsch, Assistant Public Guardian, Chicago, for appellees J.P. and T.P.
Justice TULLY delivered the opinion of the court:
Respondents, Catherine P. and Thomas P., the natural parents of minors, J.P. and T.P., appeal separately from: (1) the trial court's June 8, 1999 adjudication order, finding T.P. neglected and abused, being subject to an injurious environment and at substantial risk of physical harm, as defined in sections 2-3(1)(b) and 2-3(2)(ii) of the Juvenile Court Act of 1987 (705 ILCS 405/2-3(1)(b), 2-3(2)(ii) (West 1999)), and (2) the trial court's November 30, 1999 dispositional order finding respondents unable or unwilling to care for or protect T.P., adjudging T.P. a ward of the court and placing T.P. in the custody of the DCFS (Department of Children and Family Services) Guardianship Administrator with the right to place him, pursuant to section 2-27 of the Act (705 ILCS 405/2-27 (West 1999)). Thomas also separately appeals the trial court's November 30, 1999 modified dispositional order changing the goal for J.P. to private guardianship. Catherine P.'s appeal (No. 1-99-4165) and *1163 Thomas P.'s appeal (No. 1-99-4405) were consolidated for purposes of review. For the following reasons, we affirm.

BACKGROUND
The record indicates J.P. was born on August 23, 1990. T.P. was born on January 17, 1998. Catherine P. (Catherine) and Thomas P. (Thomas) are their parents. On December 4, 1990, the State filed a petition for adjudication of wardship of J.P., alleging J.P. was neglected and subject to an injurious environment. A temporary custody hearing was held on December 18, 1990, at the conclusion of which, the trial court entered an order of protection ordering Catherine and Thomas to: (1) provide all necessary care, including proper medical care, for the well being of J.P., (2) submit to psychological and drug evaluations, (3) enter and complete marriage counseling, (4) notify DCFS of any change of address, cooperate with all reasonable requests of DCFS, and give DCFS caseworkers full home access at reasonable times. Thomas was further ordered not to abuse Catherine mentally or physically. On November 4, 1991, DCFS filed a petition for supplemental relief alleging that Thomas violated the order of protection by not providing all necessary care for J.P.'s well being, not cooperating with DCFS's reasonable requests, not submitting to psychological and drug evaluations and by continuing to abuse Catherine. The court thereafter entered an order of protection ordering Thomas to have no contact with J.P., Catherine, or Catherine's family. On May 8, 1992, the trial court entered an adjudication order finding that J.P. was neglected and subject to an injurious environment. The trial court found the conditions in respondents' household to be violent and chaotic, and that Catherine was subject to domestic violence by Thomas. On October 2, 1992, the court entered an order of protective supervision ordering that Catherine provide all necessary care for the well-being of J.P., cooperate with all reasonable requests by DCFS, continue in counseling and participate in parent/child development classes, and not to allow any unsupervised contact between Thomas and J.P. On March 17, 1993, the DCFS filed a motion to vacate the order of protective supervision on the basis that Catherine violated the protective order by allowing unsupervised contact between Thomas and J.P. On March 25, 1993, the trial court issued a juvenile arrest warrant for J.P. The warrant was extended through August 24, 1995. On November 4, 1996, the warrant was quashed and recalled and temporary custody was taken of J.P. On November 15, 1996, a supplemental protective order for supervised visitation was entered allowing Catherine and Thomas supervised visitation with J.P. in the presence of DCFS, prohibiting respondents from attempting unsupervised contact with J.P., and ordering respondents to cooperate with all reasonable requests of DCFS, including undertaking parenting classes and substance abuse assessments.
On January 17, 1998, T.P. was born. On February 22, 1998, T.P. was taken into protective custody at Cook County Hospital. On February 24, 1998, the State filed a petition for adjudication of wardship of T.P. alleging (1) injurious environment, in that a finding of abuse and neglect had previously been entered with respect to T.P.'s sibling, J.P., and respondents had not been compliant with recommended services, including psychiatric and mental health treatment and (2) physical abuse and substantial risk of physical injury, in that T.P. was admitted to the hospital on February 17, 1998 for rectal bleeding and a swollen stomach, the cause of which was *1164 suspected trauma, and respondents had threatened the hospital staff and attempted to remove T.P. from the hospital against medical advice. On February 24, 1998, the court entered a temporary custody order that T.P. be removed from respondents' custody and that respondents be allowed supervised visitation. On February 4, 1999, the trial court entered a plenary order of protection, ordering that Thomas refrain from physical abuse, harassment, stalking, exploitation, neglect, willful deprivation or intimidation of T.P. or T.P.'s guardian, and ordering Thomas not to come within 100 yards of T.P.'s home or remove T.P. from Illinois.

Adjudication Hearing
On March 16, 1999 an adjudication hearing was held in T.P.'s case. Lilliana Morfin (Morfin), a caseworker, testified on behalf of the State and the Guardian. Morfin represented that J.P.'s case first came into the system in 1990 and she was assigned to the case in 1997. The case plan in 1997 allowed respondents monthly supervised visits with J.P. Morfin stated that the reason the visits were supervised was because two juvenile arrest warrants were previously issued in 1993 and 1996, when respondents and J.P. could not be located. When contact with respondents was reestablished in 1997, Morfin referred respondents for services. Prior to 1997, referrals had been made for parenting classes, a psychological evaluation, and a drug and alcohol assessment, but respondents ignored the referrals. In September and October of 1997 Morfin referred Thomas for parenting classes, a psychological assessment, a drug and alcohol evaluation, and counseling, but Thomas did not attend scheduled appointments or pursue the referrals. Morfin also referred Catherine for parenting classes, a psychological assessment, a drug and alcohol evaluation, and counseling in August, September and October of 1997, but Catherine ignored the referrals. At the end of 1997, the goal for J.P. was changed from return home to termination of parental rights because respondents would not comply with the referrals. Morfin stated that in December of 1997, she met with respondents in court, at which time both respondents acted belligerently and indicated that they would not utilize any services. Thomas was rude, loud and aggressive towards Morfin, and at one point, threatened her that if anyone adopted J.P., he would kill that person and anyone who had helped in the adoption. In November of 1997, Morfin visited respondents' home and Catherine informed her that she was 7 months pregnant. Following a court appearance on December 12, 1997, Morfin advised Catherine of the tasks expected of her under the administrative case review, including prenatal checkups and medical checkups to monitor her pregnancy. Catherine at that time denied that she was pregnant. Between December and January, Catherine did not attend visits with J.P., although Thomas attended visits and kept in regular contact with Morfin. On January 20, 1998, during a visit with J.P., Thomas made Morfin aware that Catherine had given birth on January 17, 1998 to T.P. Thomas told Morfin that the reason Catherine had not attended the visits with J.P. was that she was at home with T.P. Morfin thereafter made an unannounced visit to respondents' residence to check on T.P., but no one was at home. Morfin subsequently called to the DCFS hotline, and the juvenile court took temporary custody of T.P. Morfin stated she repeatedly advised respondents of the importance of following through with the services in order to get their children back, but respondents refused to comply. On the State's motion, the trial court admitted into evidence and took judicial notice of a 1996 juvenile arrest warrant entered in J.P.'s case.
*1165 On cross-examination, Morfin admitted that the referrals she gave for services were offered prior to the time of T.P.'s birth. Morfin also represented that at some point prior to 1997, she believed respondents had submitted to psychological evaluations, although Morfin had not read the evaluations. Morfin admitted that Thomas had never struck her or physically intimidated her. Morfin represented she made only one unannounced visit to respondent's residence, which occurred shortly after January 20, 1998.
Kari Blackmore (Blackmore), a caseworker employed by Aunt Martha's Youth Center also testified on behalf of the State and the Guardian at the adjudication hearing. Blackmore stated that in February of 1997 she was assigned to J.P.'s case, at which time, she referred Thomas and Catherine for psychological, psychiatric, alcohol and drug assessments and referred Catherine to a battered woman's counseling group, which respondents ignored. Blackmore scheduled an appointment for March 24, 1997 for Thomas and Catherine to undergo a psychological evaluations and alcohol and drug assessments, but respondents did not attend. Blackmore referred respondents for the same services the following week, but respondents again did not comply with the services. For the next four months, Blackmore referred Catherine for services, but Catherine would not comply with any service referrals. As part of the service plan, respondents were provided with weekly supervised visits with J.P., but respondents did not visit weekly. Blackmore stated that between March and April of 1997 difficulties arose regarding the location of the supervised visits, as Thomas expressed dissatisfaction with the chosen location because of the ethnicity of the neighborhood. On April 29, 1997, Blackmore and Thomas resolved this problem by finding a new location for visitation, but respondents attended the scheduled visitation only sporadically. Sometimes, the visits went very well and Thomas was very good with J.P., at other times, Thomas acted in an inappropriate manner, and the visits would have to be terminated. Blackmore recounted that on one occasion, in May of 1997, a visit was terminated when Thomas and Catherine told J.P. that his foster parents had taken him away from them illegally, that the judge had done this to hurt respondents, and that it was a game and J.P. was supposed to fight back. When Blackmore attempted to terminate the visit, Thomas and Catherine became very angry, J.P. began crying, and a chair was knocked over. Security was called, and from that point on Blackmore brought an additional case aide worker to visits. Blackmore stated that a similar incident occurred with respondents on February 27, 1997 in a court conference room. Blackmore was attempting to engage respondents in services when Thomas became extremely angry, began yelling at Blackmore, and followed her out of the conference room when she left. Thomas threatened Blackmore that if J.P. was not returned to him, everyone involved in the case, both past and present, would be killed. The Sheriff was called and Blackmore was taken to the Guardian's office until Thomas left the building. Blackmore testified that she repeatedly advised Thomas it was necessary for him to engage in services in order to be reunited with his children and to show DCFS that he was an adequate parent. Blackmore stated that Thomas expressed no interest in services, was uncooperative, and indicated to her that he did not have to complete the services because he had not done anything. Blackmore testified that she sent Thomas letters by both regular and certified mail regarding the need for services, but Thomas told her to stop sending him *1166 letters. Blackmore represented that the last time she spoke to Thomas and referred him for services was in June of 1997, and at that time, neither Thomas nor Catherine had complied with any of the services offered.
On cross examination, Blackmore admitted that she had no personal knowledge of whether respondents complied with any service referrals prior to 1997. Blackmore denied that Thomas expressed reservations about going to the initial visitation location because he had problems with gang members in that area. Blackmore agreed that the second visitation location was closer to respondents' residence. Blackmore stated that between April and July of 1997, quite a few of the scheduled visits with J.P. had to be cancelled because respondents failed to call and confirm 24 hours in advance, as required. Blackmore agreed that respondents called to confirm the visits in advance approximately 50% of the time. Blackmore represented that when the visits went well, respondents would play with J.P. and when the visits did not go well respondents would talk with J.P. about the case.
Sharon Wolford (Wolford), a DCFS investigator, testified on behalf of the State and the Guardian. Wolford stated that on February 17, 1998, she received a call from Morfin on the DCFS hotline indicating that T.P. was at risk of physical harm. Wolford went to respondents' home to investigate, and spoke to a neighbor, but she could not locate respondents. Subsequently, Wolford learned that T.P. had been admitted to Cook County Hospital and had been taken into protective custody.
Over the objection of Thomas' counsel, the court allowed into evidence a certified half sheet indicating that an order of adjudication was entered in J.P.'s case on May 8, 1992, with a finding of neglect and injurious environment. Also admitted into evidence was a certified dispositional order entered in J.P.'s case on October 2, 1992, adjudging J.P. a ward of the court. On the State's motion, and without objection, the court allowed into evidence T.P.'s medical records from his admission to the hospital on February 17, 1998. The information contained in the records and published at trial was as follows.
On February 17, 1998, Catherine took T.P. to the hospital because he had blood in his stool on three occasions. T.P. was admitted. A social worker consultation report dated February 19, 1998 indicated:
"34 day old white male admitted * * * During history and physical discovered that Mom has [a] son living with aunt for 1 year. DCFS was notified. Father had several episodes of being extremely frustrated with baby crying at hospital. Please see attending's note about specific concerns and abnormal behavior of both parents. * * * Brought in by Mom and Dad with blood in stool x 3. * * *Per mom, baby cries a lot at home. Per Mom, Dad tries to keep him quiet not to bother the neighborbut she won't let him do this anymore. Mom refuses to tell how he tries to quiet the baby. Per Dad, if baby comes home and bleed[s] per rectum again, 'there is gonna be trouble.' * * * Per Daddemanded repeatedly on 2/17/98 to give baby something to knock the child out and get him ear plugs because he's going crazy from the child crying. [Assessment] Child At Risk: Sibling placed by DCFS with Aunt; Mom refusing to let DCFS follow up with baby; Parents statements very scary; Unknown etiology rectal bleed/abdominal distension-Rule out Trauma.* * * October 1990 Dad hit mom while holding [J.P.]. Head Injury. March 1993Hid child. Violated protective order. J.P. placed with *1167 aunt by DCFS for 1 year. Mom doesn't miss him."
A resident's note dated February 19, 1995 indicated:
"Conference with father [Thomas] and [social worker] Brenda* * * [Thomas] appeared very angry and trying to restrain himself from lashing out. In his own words, `I usually act first and ask questions later but this time I am giving you the courtesy of asking questions first.' * * *[Thomas] repeatedly insisted that, `Your only goal should be to find out what the baby's problem is, treat it and send the baby home.' He said, `His past is not anyone's business and everyone should stop voicing their opinions or he will start giving his opinion.' * * * In a very hostile manner he said that 'when his wife gets upset he gets upset and something will be done about it.'"
Progress notes entered in T.P.'s chart by Dr. Denetra Soter on February 20, 1998 indicated:
"Child Protective Service. Contacted follow up agency, Aunt Martha's, to let [them] know [the] family is angry that we know about the other child being taken away. [Thomas] expressed tremendous hostility against DCFS and Aunt Martha's. Contacted Dr. Ziring and Annette Ford about our concerns about child's safety and our safety. Contacted Security to let them know family is allowed to visit, but situation may deteriorate.* * * * Accompanied ophthalmologist for exam and then to discuss findings with father. Father immediately became hostile and suspicious* * Ophthalmologist felt threatened and asked if security had been called about him and voiced concerns about safety."
A discharge planning note entered on February 20, 1998 by social worker Brenda Chevalier indicated:
"* * *Father [Thomas] * * *states [he is] upset because [the] medical staff is not talking to him and there is some concern of possible abuse.* * * Father also stated that in the past he has threatened DCFS, police, and a judge presiding over his son's case. Father also stated that if he is not treated with respect in the Cook County Hospital, he will/can become violent. Father upset, however, [he was] pleasant and cooperative with this worker. Behavior unstable, i.e. angry, smiling, threatening, appears concerned about his son and his well-being. Equals [psychological] problems. Note: if Father is agitated, he may become violent."
A consultation order and report entered by Dr. Soter on February 20, 1998 indicated:
"Case began in 1990 when Mother [Catherine] told [the] doctor that Father [Thomas] had hit her while she was holding J.P. and J.P.'s head was injured. Relatives also called the hotline. Mom was offered services. Both have histories of mental illness, but will not take medication and refuse services. * * *Everything available clearly indicates the unstable, explosive nature of the relationship of the parents, risk of physical injury, physical neglect, emotional neglect and trauma to [the] child. Child must be removed if parents are not cooperative."
Progress notes entered on February 22, 1998 at 12:15 p.m. and signed by Dr. Soter indicated:
"Dr. Shuja (senior resident) and I met with [the] Mother and Father of patient, T.P. regarding parents requesting to take the patient home today. We informed [the] parents that we can not discharge the patient today as we do not know the cause of the rectal bleeding. Father [Thomas] during this discussion was very hostile, raising his voice and *1168 stating that we have cured the patient of his medical problem and he will take the patient home today and sign for responsibility. He demanded that we remove the I.V. and give him [the] papers to sign now and threatened that we have one hour before he calls the police to report Cook County Hospital for kidnaping his child. One half hour after [the] family meeting, [the] police did show up. Officer Reppen spoke with our on-call team regarding the case. He also spoke with Dr. Soter over the phone. He informed [the] father of the patient that if [the] parents did not cooperate, protective custody may need to be taken."
Progress notes entered on February 22, 1998 at 2:00 p.m. and signed by Dr. Soter and Social Worker, Brenda Chevalier, indicated:
"Social worker was called to intervene in an altercation with the father attempting to take the patient out of the hospital. The Chicago Police Department and the Cook County Hospital police were present on the ward* * *With the father and mother discussions were held [with] the officers and the ODA about the hostile nature of the parents. Threats were made at other times by the father against the staff.* * * Patient will remain in Cook County Hospital under temporary custody taken by Dr. Shuja or until the parents agree to find a doctor at another hospital willing to accept the patient. Cook County Hospital will then do a direct transfer. Under the current medical condition of the patient, [the] doctor felt patient is not to be allowed to leave AMA. * * *The parents were escorted off the ward by the Cook County Hospital police."
Progress notes entered on February 22, 1998 at 2:30 p.m. and signed by Dr. Shuja and Dr. Soter indicated:
"Parents of the patient, very agitated and angry, came and demanded that the patient be released now because he has been cured. He [Thomas] was very angry that the security person on the 1st floor said that the baby has DCFS hold. He insisted that no matter what the doctor feels or believes he will sign AMA [against medical advice] and take full responsibility for the child. He then called the police to investigate why his child is being held here without his consent.* * * Security came to the floor along with [the] social worker who investigated the situation and barred visitation for today due to his hostile behavior. After discussing the situation with Dr. Soter, protective custody of patient was taken."
Following the submission of T.P.'s records, the State and the Guardian rested. The court held that the evidence of the protective warrant entered in 1993 in J.P.'s case would not be considered, but the evidence of the warrant entered in 1996 would be considered. The court entered a finding of neglect, injurious environment, and abuse, substantial risk of injury as to T.P. In reaching this determination, the court found that the evidence demonstrated that respondents refused to participate in any services, acted with tremendous hostility towards the caseworkers and the hospital personnel treating J.P., culminating in death threats by Thomas against two caseworkers, attempted to remove T.P. from the hospital against medical advice, and refused to allow T.P. to be transferred to another hospital for continued medical treatment.

Dispositional Hearing
On November 30, 1999, the trial court conducted a dispositional hearing in T.P.'s case. Eddie Ramos (Ramos), a social worker employed by Lutheran Child and Family Services testified on behalf of the *1169 State and the Guardian. Ramos stated that he was assigned to the case on March 26, 1999, and at that time, scheduled a psychological evaluation for Catherine forJune 21, 1999. Catherine was reminded of the appointment prior to the date, but she failed to attend the appointment. Ramos also scheduled a psychological evaluation for Thomas for June 21, 1999, but he failed to attend the appointment as well. On May 19, 1999, Ramos spoke with Thomas on the telephone and explained to him that a psychological evaluation was imperative in determining what services were appropriate for him, and further services could not be offered until the evaluation was completed. Thomas responded that he was not going to comply with any services because he needed to make a living. Ramos stated that because neither Thomas nor Catherine would avail themselves of psychological evaluations, he was unable to offer further services. Ramos stated that respondents had weekly supervised visits with T.P., and that every other week, J.P. was also present during the visits. Between March and September, Catherine came for the visits, but Thomas did not. The first visit Thomas came to was on September 21, 1999. Ramos stated that on September 28, 1999, an unusual incident occurred when Catherine and Thomas came for a visit. On that date, Ramos received a phone call from a Department of Child Protection investigator that Thomas and Catherine had searched T.P.'s body, found marks on the back of his waistline and the palm of his hand, and voiced concern that the marks were cigarette burns. As a result of respondents' allegations, a hotline call was placed, and the foster parents were asked to take T.P. to the emergency room. Ramos stated that the emergency room doctor determined that the marks were insect bites and T.P.'s foster parent indicated to Ramos that she was reprimanded by the emergency room physician for wasting the emergency room's time. Ramos stated that another unusual incident occurred on October 12, 1999 during a visit. On that date, respondents arrived for the visit at 11:30 a.m., although the visits were always scheduled from 11a.m. to 12p.m. When Ramos informed respondents that they were late, and that visits were to begin at 11a.m., respondents insisted that visits began at 11:30 a.m. pursuant to court order. At 12p.m., Ramos informed respondents that the visit was over. Catherine responded, "you are not going to do this, over my dead body," and had the DCFS legal representative paged. While respondents and Ramos were waiting for the DCFS representative, a case aide gave T.P. a cracker and T.P. called the aide "mommy." Catherine became upset, told the case aide that it was not appropriate, challenged the case aide to a fight and called the case aide a profanity. Ramos told Catherine that her behavior was unacceptable and she would have to calm down, asked the case aide to step outside, and paged the sheriff. When the sheriff and the DCFS legal representative arrived, it was approximately 12:30 p.m. and respondents were asked to leave. Ramos testified that when he would go to pick up T.P. for visits with respondents, T.P. would cling to his foster parents and cry for 15 to 20 minutes on the way to the visit. Ramos stated that although T.P. ordinarily did not suck his thumb, on days of scheduled visits with respondents, he would.
On cross-examination, Ramos stated that respondents very specifically stated they would not cooperate with any services offered. Thomas stated to Ramos that he would not comply with any services because he needed to make a living and Catherine indicated that she didn't have time for services because she was looking for a job. Ramos admitted that he was *1170 not present during the September 28, 1999 visit which led to T.P.'s emergency room visit. Ramos stated that since September, Thomas had visited T.P. regularly, as did Catherine, although she did not show up for a few visits. Ramos admitted that after June 21, 1999, he did not make any further attempts to enroll Catherine for a psychological evaluation. Ramos stated that T.P. had strongly bonded with his foster parents.
On re-direct examination, Ramos represented that during visits with T.P. and J.P., Catherine directed most of her attention towards J.P. Ramos stated that during one visit, Catherine made an inappropriate comment to J.P. in T.P.'s presence. J.P. had been given a snack by an aide and Catherine told J.P. he had to be careful because there were people who were trying to poison him, just like there were people trying to poison respondents. Ramos recommended that a guardian be appointed to T.P. with the right to place him because respondents had not complied with any services. Following the submission of Ramos' testimony, the State and Guardian rested.
Catherine testified on her own behalf at the dispositional hearing. Catherine stated that with respect to the October 12, 1999 incident, the following exchange occurred. Catherine and Thomas arrived approximately 15 minutes late for the visit that day. At approximately 12:10 p.m., Ramos told respondents that the visit was over because the case aide, Latrice, was in a hurry to get T.P. back to his foster parents. Catherine went to check on the time because she didn't believe the visit was over. When she returned she told Latrice that she was going to sit there until the end of the visit because it was their allotted court time. The case aide began dressing T.P. to go, and Catherine protested. The case aide then dangled some food in front of T.P. to get T.P. to come to her and leave early, and Catherine told the aide not to use food to control her child. The case aide told Catherine they should talk about it with Ramos. When Catherine went to find a DCFS legal representative, she heard the case aide say to Ramos, "Hold me back, hold me back." Catherine told the aide not to hold back, and to do whatever she was going to do to her.
On rebuttal, Catherine admitted that she was uncertain how often she visited T.P. The State introduced into evidence and published a court order entered August 4, 1998, which provided that visits between respondents and T.P. would occur weekly at 11a.m. Catherine admitted she was uncertain about the scheduled time of the visits, but stated that many visits had begun at 11:30 a.m. Catherine agreed that during the altercation with the case aide on October 12, 1999, she had called the case aide a profanity.
At the close of evidence, the State and the Guardian requested that D. Jean Orteg Piron be appointed guardian of T.P., with the right to place him, and that the court find Catherine and Thomas unwilling and unable to care for and protect T.P. The court found respondents unable or unwilling to care for or protect T.P., that reasonable efforts had been made to prevent the need for removal of T.P. from the home but had been unsuccessful, and in the best interests of the minor, adjudged T.P. a ward of the court. In reaching its determination, the court noted that respondents were offered services before and after the adjudication order was entered, had refused to participate in any services, and Thomas had failed to attend any visits with J.P. for seven months.
Immediately following the dispositional hearing on T.P., the court held a permanency planning hearing in J.P.'s case. At *1171 the hearing, Ramos testified that J.P. was nine years old, had been placed with his maternal aunt, and that the placement was safe and appropriate. Ramos stated that he had been assigned to the case since March 26, 1999, and since that time respondents had not complied with any services. Ramos stated that based on his review of the case file, he did not believe respondents had complied with any services since J.P.'s case came into the system in 1990. Ramos recommended private guardianship for J.P. because respondents had not made reasonable efforts towards reunification. On the State's motion, the service plan for J.P. was entered into evidence. Following the submission of this evidence, the trial court entered a modified dispositional order, finding the appropriate goal for J.P. was private guardianship, the services contained in the service plan were appropriate and reasonably calculated to achieve the goal, and that respondents had refused all services provided.
On December 3, 1999, Catherine filed a notice of appeal from the November 3, 1999 dispositional orders as to T.P. and J.P. On December 17, 1999, Thomas filed a notice of appeal from the June 8, 1999 adjudication order and the November 30, 1999 dispositional orders entered with respect to J.P. and T.P.

DISCUSSION

Adjudication Order
The first issue raised on appeal concerns the propriety of the trial court's adjudication order. Respondents, Catherine and Thomas, both argue that the court's finding of abuse and neglect as to T.P., in being subject to an injurious environment and at substantial risk of physical injury, was against the manifest weight of the evidence. Thomas specifically argues that in reaching its determination, the trial court: (1) improperly relied on incompetent evidence of a finding of neglect in J.P.'s case to find T.P. abused and neglected, and (2) improperly relied on threatening statements made by Thomas to caseworkers and hospital personnel where there was no evidence that Thomas' temper was ever directed at T.P. or that T.P. was physically injured. Catherine similarly argues that the evidence of respondents' anger towards third parties did not support as finding of abuse and neglect, as there was no evidence connecting respondents' displays of temper to their care of T.P.
Before addressing the merits of these arguments, we note that the notice of appeal filed by Catherine specifies that appeal is taken solely from the November 30, 1999 dispositional order. Illinois Supreme Court Rule 303(b)(2) (155 Ill.2d R. 303(b)(2)) requires a notice of appeal to "specify the judgment or part thereof or other orders appealed from and the relief sought from the reviewing court." When an appeal is taken from a specified judgment, the appellate court acquires no jurisdiction to review other judgments or parts of judgments not specified or fairly inferred from the notice. Alpha Gamma Rho Alumni v. People ex rel. Boylan, 322 Ill.App.3d 310, 313, 255 Ill.Dec. 701, 750 N.E.2d 282 (2001). Because Catherine's notice of appeal does not specify appeal is taken from the court's June 8, 1999 adjudication order, we are without jurisdiction to consider her claims with respect to this order. See In re J.J., 316 Ill.App.3d 817, 826, 250 Ill.Dec. 103, 737 N.E.2d 1080 (2000), appeal allowed, 193 Ill.2d 587, 253 Ill.Dec. 2, 744 N.E.2d 284 (2001); In Interest of Lakita B., 297 Ill.App.3d 985, 991, 232 Ill.Dec. 88, 697 N.E.2d 830 (1998). Accordingly, we dismiss that portion of Catherine's appeal pertaining to the adjudicatory order. However, we do address Thomas' claims pertaining to the adjudicatory *1172 order, which claims, in any event, are largely duplicative of Catherine's claims.
At an adjudicatory hearing, the trial court's first responsibility is to determine whether the minor is abused, neglected, or dependent. 705 ILCS 405/2-18(1) (West 1999). It is the State's burden to prove the neglect or abuse alleged in any wardship petition by a preponderance of the evidence. In re B.T., 204 Ill.App.3d 277, 280, 149 Ill.Dec. 573, 561 N.E.2d 1269 (1990). Preponderance of the evidence is that amount of evidence that leads a trier of fact to find that the fact at issue is more probable than not. In Interest of K.G., 288 Ill.App.3d 728, 735, 224 Ill.Dec. 534, 682 N.E.2d 95 (1997). A trial court's determination of a neglect or abuse issue is entitled to great deference and will not be disturbed on appeal unless contrary to the manifest weight of the evidence. In re A.D.W., 278 Ill.App.3d 476, 482, 215 Ill. Dec. 308, 663 N.E.2d 58 (1996). A trial court's finding is deemed "against the manifest weight of the evidence" only if a review of the record clearly demonstrates that the opposite result is proper. K.G., 288 Ill.App.3d at 735, 224 Ill.Dec. 534, 682 N.E.2d 95.
The concept of "neglect" is not static, it has no fixed and measured meaning, but draws its definition from the individual circumstances presented in each case. K.G., 288 Ill.App.3d at 736, 224 Ill. Dec. 534, 682 N.E.2d 95. Neglect based on "injurious environment" is a similarly amorphous concept not readily susceptible to definition. In re S.D., 220 Ill.App.3d 498, 502, 163 Ill.Dec. 207, 581 N.E.2d 158 (1991). However, as a general rule neglect is "the failure to exercise the care that circumstances justly demand and encompasses both wilful and unintentional disregard of parental duty." In Interest of M.K., 271 Ill.App.3d 820, 826, 208 Ill.Dec. 242, 649 N.E.2d 74 (1995). Under the Act, "proof of the abuse, neglect or dependency of one minor shall be admissible evidence on the issue of abuse, neglect or dependency of any other minor for whom the respondent is responsible." 705 ILCS 405/2-18(3) (West 1999). Sibling abuse may be prima facie evidence of neglect based upon an injurious environment. In re S.S., 313 Ill.App.3d 121, 127-28, 245 Ill.Dec. 808, 728 N.E.2d 1165 (2000). However, this presumption is not permanent; it weakens over time and can be rebutted by the introduction of other evidence. S.S., 313 Ill.App.3d at 128, 245 Ill.Dec. 808, 728 N.E.2d 1165. There is no per se rule of anticipatory neglect in Illinois, and each case concerning the adjudication of minors must be reviewed according to its own facts. In re Edricka C., 276 Ill.App.3d 18, 31, 212 Ill.Dec. 383, 657 N.E.2d 78 (1995). To determine whether a finding of anticipatory neglect is appropriate, the trial court should consider the current care and condition of the child in question and not merely the circumstances that existed at the time of the incident involving the child's sibling. Edricka C., 276 Ill.App.3d at 28, 212 Ill.Dec. 383, 657 N.E.2d 78. In this case, the trial court concluded T.P. was neglected as defined under the Act based on a finding of "injurious environment." In making its determination that T.P. was neglected, the trial court took into consideration the finding of neglect entered in J.P.'s case, the child protective warrant issued in J.P.'s case, and respondents refusals to engage in any services in J.P.'s case, leading up to the time of T.P.'s birth. As respondent points out, the specific factual basis underlying the finding of neglect as to J.P. was not before the court, as the court was presented only with a certified half sheet showing that a general finding of neglect, injurious environment, was entered in J.P.'s case. However, it is clear from the trial court's *1173 extensive findings in the record that the court did not focus primarily on the neglect of J.P. to find T.P. neglected. Rather, the court specifically indicated that it considered the history of J.P.'s case as a contextual backdrop of events leading up to T.P.'s birth and his removal from the home, as well as evidence of respondents' unabated pattern of rejecting reunification services. Contrary to respondent's assertion, it is evident from the trial court's findings, specifically the court's concentration upon respondents' conduct in attempting to remove T.P. from the hospital, that the court's determination of neglect was premised upon consideration of T.P.'s current care and condition, not solely the past finding of neglect as to T.P.'s sibling, J.P.
Respondent additionally contends that the evidence of respondents' statements to caseworkers and hospital personnel did not support a finding of neglect and injurious environment. Respondent posits that the facts of the instant case are similar to those in, In re N.B., 191 Ill.2d 338, 246 Ill.Dec. 621, 730 N.E.2d 1086 (2000), wherein the Illinois Supreme Court held that evidence of a respondent-mother's angry outburst was insufficient to demonstrate an injurious environment.
We find the facts of the present case to be distinguishable. In N.B., the evidence which the court found insufficient to support a finding of injurious environment consisted of a single, isolated temper tantrum by a homeless respondent-mother which occurred when she was denied redemption of milk coupons for her infant at a health facility. N.B., 191 Ill.2d at 351, 246 Ill.Dec. 621, 730 N.E.2d 1086. The court there concluded no proof was adduced at the adjudicatory hearing to support the inferential leap that "when respondent loses her temper she becomes blinded to the well-being of her children" and there was also testimony that respondent's level of frustration was consistent with any parent's reactions to a three year old. N.B., 191 Ill.2d at 351, 246 Ill.Dec. 621, 730 N.E.2d 1086. By contrast, in the instant case, the evidence of respondents' loss of temper was not confined to a single, isolated instance. Rather, the evidence indicated a pattern of behavior by respondents, consisting of extreme displays of aggression and hostility, some of these displays occurring in the presence of their children. Caseworkers, Morfin and Blackmore both testified regarding respondents' hostile behavior towards DCFS, including death threats made by Thomas against the two caseworkers. Hospital records provided further testament to the degree of respondent's aggression, showing that Thomas threatened hospital staff, attempted to remove T.P. from the hospital against medical advice, and refused to allow T.P. to be transferred to a different hospital for treatment. In sum, unlike in N.B., the evidence in this case demonstrated a connection between respondents' anger and the well being of T.P. Unlike in N.B., there was evidence of respondent's anger operating to blind him to the wellbeing of his child, as evidenced by Thomas' attempt to remove T.P. from the hospital, his refusal to allow the transfer of T.P., and respondents' adamant refusals to engage in any services. Considering the totality of the evidence, we cannot say that the court's finding of neglect, injurious environment, as to T.P., was against the manifest weight of the evidence.
Contrary to respondent's assertions, we also find the evidence was sufficient to support a finding of abuse, based on a "substantial risk of physical injury." The definition of "abused minor" under the Act provides:
"(2) Those who are abused include any minor under 18 years of age whose parent or * * * any individual residing *1174 in the same home as the minor, or a paramour of the minor's parent
(ii) creates a substantial risk of physical injury to such minor by other than accidental means which would be likely to cause death, disfigurement, impairment of emotional health, or loss or impairment of any bodily function." 705 ILCS 405/2-3(2)(ii)(West 1998).
As set forth in detail above, the record in this case contains numerous examples of respondents acting with disproportionate aggression and extreme hostility to the detriment of T.P. Although, as Thomas points out, his anger was ostensibly directed towards DCFS and Cook County hospital personnel, a connection was demonstrated between this anger and his actual treatment of T.P. A substantial risk of physical harm to T.P. was clearly evidenced by respondent's attempt to remove T.P. from the hospital against medical advice and his refusal to allow T.P.'s transfer to another hospital for treatment. Again, considering the totality of evidence, we do not find that the court's finding of abuse, based on a substantial risk of physical harm, was against the manifest weight of the evidence. For these reasons, we affirm the trial court's June 8, 1999 adjudication order.

Dispositional Order
Respondents, Catherine and Thomas also contest the trial court's dispositional order, and contend that the court's finding that respondents were unable or unwilling to care for or protect T.P. was against the manifest weight of the evidence. Specifically, respondents contend that the court's determination that respondents had failed to undertake any reunification services was erroneous because the evidence of whether services had been offered was conflicting. Thomas also separately asserts that the modified dispositional order entered in J.P.'s case was without evidentiary support.
Although we address the merits of respondents' claims concerning the dispositional order in T.P.'s case, we will not address Thomas' claim concerning the modified dispositional order entered as to J.P. Respondent does not reference the record or cite to pertinent authority, and his argument consists essentially of the bare assertion of the issue sought to be raised. Under the circumstances, we are well within our discretion to decline review of the issue. See In Interest of S.J.K., 149 Ill.App.3d 663, 671, 103 Ill.Dec. 75, 500 N.E.2d 1146 (1986).
Section 2-27 of the Act governs dispositional hearings, and provides in pertinent part:
"(1) If the court determines and puts in writing the factual basis supporting the determination of whether the parents * * * of a minor adjudged a ward of the court are unfit or are unable, for some reason other than financial circumstances alone, to care for, protect, train or discipline the minor or are unwilling to do so, and that it is in the best interest of the minor to take him from the custody of his parents, * * * the court may at this hearing and at any later point:

* * *
(d) commit him to the Department of Children and Family Services for care and service.
* * *
(1.5) In making a determination under this Section, the court shall also consider whether, based on the best interests of the minor, appropriate services aimed at family preservation and family reunification have been unsucessful *1175 in rectifying the conditions that have led to a finding of unfitness or inability to care for, protect, train, or discipline the minor, or whether, based on the best interests of the minor, no family preservation or family reunification services would be appropriate." 705 ILCS 405/2-27 (West 1999).
On review of a trial court's 2-27 dispositional determination, the trial court will be reversed only if the findings of fact are against the manifest weight of the evidence or if the trial court committed an abuse of discretion by selecting an inappropriate dispositional order. In Interest of Lakita B., 297 Ill.App.3d 985, 994, 232 Ill.Dec. 88, 697 N.E.2d 830 (1998).
Upon review of the record, we find the trial court's findings were adequately supported by the evidence and the dispositional order selected by the court was appropriate. Although respondents contend the evidence regarding the offering of services was conflicting, the record undermines this contention.
At the dispositional hearing, caseworker Ramos testified he advised Thomas that a psychological evaluation was imperative in order to determine what further services were needed, but Thomas and Catherine explicitly refused services, and represented that they did not have time for services because of their work obligations. Ramos further testified that he made appointments for respondents to undergo a psychological evaluations on June 21, 1999, but neither respondent attended. Ramos also related that Thomas failed to attend any visits with T.P. between March and September of 1999, and that Catherine acted inappropriately during two visits with T.P. Ramos additionally observed that T.P. cried and sucked his thumb on the days he was scheduled to visit respondents, and that T.P. had bonded well with his foster parents.
In light of the above testimony, we cannot say that the trial court's determinations that respondents were unable or unwilling to care for or protect T.P., that reasonable efforts were made but have been unsuccessful, and that it was in T.P.'s best interests to be adjudged a ward of the court were against the manifest weight of the evidence.
For the foregoing reasons, the trial court's June 8, 1999 adjudication order and November 30, 1999 dispositional orders are affirmed, and appeal, No. 1-99-4165, is dismissed in part for want of jurisdiction.
Appeal No. 1-99-4165, dismissed in part, affirmed in part.
Appeal No. 1-99-4405, affirmed.
McNULTY and COUSINS, JJ., concur.