NOTICE
Decision filed 03/30/23. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2023 IL App (5th) 220709-U

NO. 5-22-0709

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

___

| | | |
|---|---|---|
| *In re* M.W., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Fayette County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 22-JA-7 |
| | ) | |
| John W., | ) | Honorable |
| | ) | Douglas L. Jarman, |
| Respondent-Appellant). | ) | Judge, presiding. |

___

JUSTICE WELCH delivered the judgment of the court.
Justices Cates and Barberis concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The trial court's finding that the minor child was neglected was not against the manifest weight of the evidence.

¶ 2    In January 2022, the State filed a petition for adjudication of wardship as to M.W. (born January 14, 2022), the minor child of the respondent, John W., asserting that the child was neglected. After an August 2022 adjudicatory hearing, the Fayette County circuit court found that M.W. was neglected because her environment was injurious to her welfare. On October 6, 2022, the court (1) found John W. unable for some reason other than financial circumstances alone to care for, protect, train, or discipline M.W. and (2) placed M.W.'s custody and guardianship with the Department of Children and Family Services (DCFS).

1

¶ 3    John W. appeals, contending that the circuit court's finding that M.W. was neglected was against the manifest weight of the evidence. Dawn P., who was the mother of M.W., was not part of this appeal as she filed a separate appeal, which was docketed as 5-22-0690. The decision in that appeal was filed on March 15, 2023. For the reasons that follow, we affirm.

¶ 4                                    I. BACKGROUND

¶ 5    As a preliminary matter, pursuant to Illinois Supreme Court Rule 311(a)(5) (eff. July 1, 2018), except for good cause shown, this court is to issue a decision within 150 days after the filing of the notice of appeal. Accordingly, Rule 311(a)(5) requires the decision in this case to be filed on or before March 27, 2023. In order to give this case the attention it deserves, this court finds it necessary to file this disposition past the due date, and we find good cause to issue our decision outside the 150-day timeframe.

¶ 6    On January 18, 2022, the State filed a petition alleging that M.W. was neglected pursuant to section 2-3(1)(b) of the Juvenile Court Act of 1987 (705 ILCS 405/2-3(1)(b) (West 2020)), as M.W.'s environment was injurious to her welfare. Specifically, the petition asserted that, while Dawn P. was in the hospital after giving birth to M.W., it was discovered that she had six other children who had been removed from her care; four of the children were removed from her care for physical abuse (from 2005 through 2010), and two of the children were removed for neglect (2012 and 2018). John W. was not the father of these children. Also, Dawn P. had been indicated for sexual molestation of one of her children in 2007 when the minor daughter was five years old. The petition alleged that Dawn P. had been diagnosed with bipolar disorder, anxiety, and depression; she completed no mental health treatment; she was not on any medication; and she had no services in place. The petition also alleged that, during this pregnancy, she did not seek any

2

prenatal care; both parents admitted that they had no items to care for M.W. upon discharge; and Dawn P. tested positive for marijuana but denied other drug use.

¶ 7    That same day, DCFS filed a shelter care hearing report, in which it was reported that, in 2005, Dawn P. was admitted into the hospital for a mental health breakdown. She was being treated for bipolar disorder, but she signed herself out of treatment against her doctor's recommendation. In 2007, she was indicated for sexual molestation of one of her children after the child reported that she had been touched "inside [her] underpants" by both of her parents. Although Dawn P. had completed a sex offender assessment, she never completed the treatment because she felt it was not needed.

¶ 8    On February 18, 2022, DCFS filed a family service plan, which indicated that previous service plans were unsatisfactory toward reunification; Dawn P. had a history of mental illness and reported being diagnosed with anxiety, depression, posttraumatic stress disorder, borderline personality disorder, and bipolar disorder; and she reported that she was not taking any medication for her mental health issues. The plan also indicated that both parents reported that they had no supplies for M.W., other than onesies, blankets, and bottles; they did not have a crib or a car seat to take M.W. home; and they did not understand how Dawn P.'s past behaviors and previous history impacted their ability to safely care for a child.

¶ 9    On March 24, 2022, DCFS filed an integrated assessment, which indicated that Dawn P. had an open family case with DCFS from December 2012 until November 2016 that related to her previous substance abuse issues and untreated mental health issues. She also had an open family case with DCFS from September 2005 until July 2010 due to her untreated mental health issues. Dawn P. could not remember how many times she had been previously hospitalized for her mental health issues; she believed her first hospitalization occurred when she was 17 years old. Although

3

she had a long history of substance abuse issues and mental health difficulties, she had not received consistent treatment. There was no information to indicate that she participated in sex offender treatment. She had previous convictions for two counts of burglary and one count for "dangerous drugs." Her last arrest was in September 2020 for disorderly conduct. The assessment also indicated that she did not receive prenatal care during her pregnancy with M.W. and that M.W. was born with exposure to marijuana. However, M.W. was born at 40 weeks; weighed nine pounds, six ounces; and was in good medical health.

¶ 10 On July 20, 2022, the State filed an amended petition for adjudication of wardship, which reiterated the allegations against Dawn P. but also asserted that John W. had been previously convicted of two counts of assault and one count of burglary in Whiteside County. There had also been an order of protection entered against John W. in which his mother was the protected party because he had been verbally aggressive with her and attempted to intimidate her. The petition also alleged that John W. had made threats of harm to the child welfare personnel and currently all contact with him occurred in public settings for safety reasons.

¶ 11 On May 27, 2022, DCFS filed a pre-adjudication report, which indicated that, during a February 16, 2022, visit, John W. made several indirect threats to the assigned caseworker. According to the report, John W. was agitated because he did not understand why M.W. could not return home, and he threatened that, "if [he] had to, [he] would put [the caseworker] up against the wall and have three guys beat [the caseworker] and do what [he] had to do." He also said that he would "do anything for [his] daughter" and referenced being "stabbed in the streets several times," "calling a meeting of his people," and being in and out of prison for the past 12 years. The report also indicated that John W. was a previous member of a criminal gang. Based on this incident, it was decided that all future parent/caseworker visits would be held in a public place.

4

¶ 12    On August 25, 2022, the trial court held an adjudicatory hearing.  At the hearing, Noelle Lamacchia, a DCFS investigator, testified that she became involved in this case in January 2022 when she was assigned to do a home safety check for the family and determine what items they had for the baby.  She met with Dawn P. and John W. at the home, and they showed her some clothing that they had for the child.  John W. indicated that they had not purchased a bed or other items yet because he was waiting to get paid.  Also, Dawn P. did not have any prenatal care while pregnant.  Lamacchia acknowledged that there were no safety concerns with the residence.  At the time of the home visit, M.W. was already in protective custody.  Lamacchia noted that there was concern about the parents coming to the hospital with no car seat.  However, she acknowledged that they did not own a vehicle.  Lamacchia indicated that Dawn P. denied any history of mental health issues, and Lamacchia was not aware of Dawn P. participating in any mental health treatment.

¶ 13    Avery Liss, a DCFS caseworker, testified that she became involved in the case approximately one week after M.W. was born.  Liss visited with both parents to discuss Dawn P.'s past DCFS involvement, the reasons why M.W. was taken into protective custody, and transitioning to placement.  Liss explained that Dawn P. had four children taken into care and that case was from approximately 2005 through 2010; Dawn P. then had two more children who were also taken into care, and those cases started in 2012 and ended in 2018.

¶ 14    Liss explained that Dawn P. was indicated by DCFS on a sexual molestation allegation in 2005 and had mental health issues for which treatment was recommended.  The children were removed from the home in 2012 because Dawn P. was having a mental health crisis where the police had to get involved.  Dawn P. had been diagnosed with bipolar disorder and anxiety.  Her service plan recommendations included mental health services, counseling for her substance abuse

5

issues, domestic violence services, and random drug screens. In those previous DCFS cases, she had made some progress with some services, but she did not fully complete any of her services. Although she completed a mental health assessment, she did not follow through with the recommended counseling. The cases were closed by adoption, and none of the children were returned home. Liss did not believe that Dawn P. was taking any medication for her mental health issues.

¶ 15 Liss acknowledged that Dawn P. completed a psychosexual evaluation in 2008, and, although the evaluation concluded that Dawn P. needed further services, she was not high risk for reoffending. Dawn P. had not given Liss any information indicating that she had completed these services, and the DCFS notes in the case file indicated that she never followed up for any additional services based on that recommendation. Also, even though Dawn P. had previous issues with methamphetamine use, there had been no indication in the current case that methamphetamine use was an issue.

¶ 16 Liss testified that John W. had no prior involvement with DCFS. However, he had criminal charges pending in Fayette County, and he had an extensive criminal history. Liss had only been to the residence on three occasions, but there had been an incident during one of the visits where John W. threatened Liss. During that incident, John W. was very agitated that M.W. was taken into care, was telling Liss about his history of being "stabbed in the streets," showed Liss his gang tattoos, and mentioned putting Liss against the wall and having his people "go at" Liss. When Liss asked what he meant by "his people," he gave odd answers, and he kept referring to being "stabbed in the streets" and doing anything for his daughter. Liss took John W.'s threats seriously and was aware that John W. had previous criminal charges for violence; he had convictions for

armed habitual criminal, aggravated battery, and burglary. John W. also had an order of protection entered against him.

¶ 17    Liss further testified that, after M.W. was taken into care, there were service plans created for Dawn P. and John W. However, neither one was participating in any services, and both had refused to cooperate with DCFS.

¶ 18    Dawn P. testified that she was 43 years old and resided in an apartment in Vandalia with John W. She explained that she attempted to get prenatal care but could not afford it; the providers did not take the insurance that she had at the time because the insurance company was not paying its bills. However, she did take vitamins every day, and M.W. was born healthy. Her other six children were also born healthy. At the time that M.W. was born, they had the basic essentials for her, such as bottles and diapers. They also had other items, such as a playpen, highchairs, and strollers; those items were in storage in Sterling, Illinois, because they had just moved into the apartment. They had a car seat that they brought home from the hospital. She claimed that she had a bag packed with some items to take to the hospital, but she was surprised to go into labor at that time, and she did not bring the bag with her to the hospital. However, she acknowledged that she had been at the health department the day before and was told that she was one day overdue.

¶ 19    Dawn P. acknowledged that she was diagnosed with bipolar disorder, depression, and anxiety. She has had a therapist at Whiteside County Health Department in Rock Falls, Illinois, since approximately 2016 or 2017, and she talked to that therapist when needed. It had been a few months since she talked to the therapist. Prior to this, she received services for mental health treatment and also had a private therapist. Although she was not court ordered to complete any services, she continued to participate in services after her last DCFS case. She was not prescribed

7

any medication for her mental health issues. She used marijuana for medicinal purposes because she had glaucoma and chronic sciatic pain.

¶ 20    Regarding the incident in 2012, Dawn P. explained that she had a nervous breakdown when her sister had a double lung transplant. Her brother and his wife were supposed to come help her, but they never showed, so she called the police on herself because she needed help. Although she was hospitalized in December 2020 for five days, she claimed that she was wrongfully hospitalized. She explained that her brother's wife called the police and claimed that she was suicidal. She had previously been prescribed medication for her anxiety, but the last time that she took the medication was in April 2021. In 2021, she went to the Sterling Police Department because she was having an anxiety attack, and they did a mental health evaluation. She was given an anxiety pill as a result of that assessment, but they did not recommend that she take any other medication for her mental health issues.

¶ 21    Dawn P. also completed substance abuse and domestic violence services and parenting classes. She completed substance abuse services with Lutheran Social Services of Illinois from 2012 until 2018, and she also completed her community service hours there. She attended alcoholics anonymous and narcotics anonymous, but she did not have any documentation verifying this. She completed a psychosexual evaluation in the previous DCFS case, but the recommendations from that evaluation were services that she was already participating in. She was in prison from January 2010 until February 24, 2012, for burglary, and she participated in services while incarcerated. Her substance abuse issues were not with methamphetamine but cocaine, and she had been sober from cocaine since January 2010. She explained that, in 2018, she was rated unsatisfactory in her service plan tasks because DCFS did not have the records that showed she had completed her services.

8

¶ 22    Dawn P. explained that her parental rights were not terminated with regard to her other children. Instead, she surrendered the children to her sister because she wanted them to have a better life; she believed that it was best for the children because she was not in a good place mentally at that time as she was in an abusive relationship. She signed the adoption paperwork in 2015 or 2016. Her sister had two of her children while the other four were with traditional foster parents.

¶ 23    Lamacchia was recalled to the stand and denied that Dawn P. and John W. mentioned that they had items for the baby in storage. She acknowledged that the hospital sent them home with a car seat because they did not have one. However, they did not have a bed, diapers, or formula; they just had a handful of clothing and some bottles.

¶ 24    After hearing the testimony and the arguments from counsel, the trial court found that the State satisfied its burden of showing that the environment was injurious to M.W.'s welfare. In making this decision, the court noted that Dawn P. was not clear on the treatment that she received, but she said that she self-medicated rather than taking the medication that was recommended for her mental illness. The court also noted that Dawn P. was not able to speculate how many times she had been hospitalized for mental illness. Looking at the totality of the circumstances, the court found that the testimony concerning Dawn P.'s failure to complete her service plans in the previous cases was credible. Although she claimed that she could not find prenatal care, she could not say which providers she contacted or how many, she did not indicate that she attempted to get any prenatal care in Whiteside County, and she was very clear that she was not ready for the child's birth as she was not expecting it.

¶ 25 That same day, the trial court entered a written adjudicatory order, which found that M.W. was a neglected minor because she was in an environment that was injurious to her welfare and that the neglect was inflicted by both Dawn P. and John W.

¶ 26 On September 20, 2022, DCFS filed a dispositional report, which indicated that, on July 26, 2022, John W. was arrested for unlawful use or possession of a weapon by a felon, aggravated assault with use of a deadly weapon, and endangering the life or health of a child. According to the police report, he was allegedly chasing after his neighbor with a knife while the neighbor was carrying a child. He had been incarcerated since July 26, and the criminal proceedings were still pending.

¶ 27 On October 6, 2022, the trial court entered a dispositional order, which found that Dawn P. and John W. were unable to care for, protect, train, or discipline M.W.; appropriate services aimed at family preservation and reunification had been unsuccessful; and it was in M.W.'s best interests to remove her from her parents' custody. Thus, the court placed custody of the minor with DCFS. On October 26, 2022, John W. filed a notice to appeal the adjudicatory order.

¶ 28                                II. ANALYSIS

¶ 29 The Juvenile Court Act of 1987 (Act) (705 ILCS 405/1-1 *et seq*. (West 2020)) establishes a two-step process for determining whether a child should be removed from his or her parents' custody and made a ward of the court. *In re D.A.*, 2022 IL App (2d) 210676, ¶ 13. First, the trial court holds an adjudicatory hearing to determine whether the minor is abused, neglected, or dependent. *In re Arthur H*., 212 Ill. 2d 441, 462 (2004); 705 ILCS 405/2-21(1) (West 2020). If the court determines that the minor is abused, neglected, or dependent, it holds a dispositional hearing to determine whether it is in the best interests of the minor and the public for the minor to

10

become a ward of the court. *In re D.A.*, 2022 IL App (2d) 210676, ¶ 13; 705 ILCS 405/2-21(2) (West 2020).

¶ 30     Section 2-3(1)(b) of the Act (705 ILCS 405/2-3(1)(b) (West 2020)) defines a neglected minor to include any minor under 18 years of age whose environment is injurious to his or her welfare. Neglect based on an "injurious environment" is not readily susceptible to definition. *In re J.P.*, 331 Ill. App. 3d 220, 234 (2002). However, neglect has generally been described as the failure to exercise the care that circumstances justly demand and encompasses willful and unintentional disregard of parental duty. *Id.* at 235. Cases involving the adjudication of neglect and wardship are *sui generis*, and each case must ultimately be decided on the basis of its own particular facts. *In re Edricka C.*, 276 Ill. App. 3d 18, 25 (1995).

¶ 31     In this case, the State's allegations of neglect are based, in part, on anticipatory neglect based on DCFS's involvement and the removal of Dawn P.'s previous children from her care. Under the Act, proof of the abuse, neglect, or dependency of one minor is admissible evidence on the issue of abuse, neglect, or dependency of any other minor for whom respondent is responsible. 705 ILCS 405/2-18(3) (West 2020). Where the allegations of neglect are premised on a theory of anticipatory neglect, the State is seeking to protect children who have a probability of being subjected to neglect or abuse because they reside, or in the future may reside, with an individual who has been found to have neglected or abused another child. *In re D.A.*, 2022 IL App (2d) 210676, ¶ 20.

¶ 32     "Although Illinois courts recognize the theory of anticipatory neglect, there is no *per se* rule that evidence of neglect of one child conclusively establishes neglect of another child." *Id.* Instead, neglect should be measured by the circumstances surrounding the siblings as well as the care and the condition of the child in question. *Id.* Also, any presumption of neglect based on

11

anticipatory neglect is not permanent as it weakens over time, and it can be rebutted by other evidence. *In re J.P.*, 331 Ill. App. 3d at 235.

¶ 33    The State has the burden of proving by a preponderance of the evidence that the child is abused, neglected, or dependent. *In re D.A.*, 2022 IL App (2d) 210676, ¶ 13.  A preponderance of the evidence is the amount of evidence that leads a trier of fact to find that the fact at issue is more probable than not. *In re J.P.*, 331 Ill. App. 3d at 234.  A trial court's determination of neglect based on an injurious environment will not be reversed unless it is against the manifest weight of the evidence. *In re D.A.*, 2022 IL App (2d) 210676, ¶ 14.  A finding is against the manifest weight of the evidence if the opposite conclusion is clearly evident or the determination is unreasonable, arbitrary, or not based on the presented evidence. *Id.*

¶ 34    Here, John W. contends that the trial court's adjudication of neglect was against the manifest weight of the evidence where there was no evidence presented showing a nexus between Dawn P.'s mental health and harm to M.W., there was no evidence presented as to Dawn P.'s current mental health issues, the previous DCFS cases were old enough that the connection between them and this case had weakened sufficiently to overcome any presumption of anticipatory neglect, and the failure to obtain prenatal care and to obtain sufficient items for the infant were not enough to show that the environment was injurious because they were due solely to the parents' financial circumstances.  Also, he contends that the trial court's written finding of neglect was contrary to the court's oral findings at the adjudicatory hearing.

¶ 35    Dawn P. was previously diagnosed with bipolar disorder, anxiety, and depression.  Due to her mental illness, she had been hospitalized on more than one occasion with the latest occurring in December 2020.  Although she could not remember how many times she had been hospitalized, she believed the first one occurred at age 17.  Also, in April 2021, she was having a severe enough

12

anxiety attack that she went to the police department, had a mental health evaluation, and was given medication. Although John W. contends that there was no nexus between Dawn P.'s mental illness and a risk of harm to M.W., we note that she testified that she surrendered her parental rights to her previous children to her sister because she was mentally broken, was not in a good place, and believed that it was necessary for them to have a better life.

¶ 36    Also, the testimony offered at the adjudicatory hearing from the DCFS workers, which the trial court found credible, indicated that Dawn P. had not completed her previous services with regard to mental health. She acknowledged that she was self-medicating with medicinal marijuana but was not taking any other prescription medication to address her mental health issues. She also explained that she talked to a therapist when she felt it necessary but had not spoken to the therapist in a few months. As for being prepared for M.W.'s birth, she acknowledged that she was not ready for the child's birth when she admitted that she was not expecting to go into labor, even though she was full term.

¶ 37    Further, in adjudicating M.W. a neglected minor, the trial court took into consideration Dawn P.'s previous DCFS cases, which ended in 2010 and 2018 with the children not being returned to her care, and her failure to complete her service plan tasks in those cases. Although we recognize her argument that sufficient time had passed to call into question the connection between those cases and the court's findings here, we note that the court's finding of neglect did not focus primarily on the prior cases and was instead a finding made based on the totality of the circumstances. Dawn P. is still in a similar posture as she was in 2010 and 2018 in that the evidence presented to the court showed that she has not completed mental health services, she is not taking any prescribed medication for her mental illnesses (other than marijuana) and had not taken any since April 2021, she had struggled with her mental health as recent as 2021, and neither parent

13

understood how Dawn P.'s previous history impacted her ability to safely care for a child. The above evidence, without any credible evidence indicating that Dawn P. had her mental health issues under control, is sufficient to support the trial court's finding that M.W. was neglected.

¶ 38   Moreover, John W. contends that the trial court's written findings of neglect were contrary to the court's oral findings because, at the adjudicatory hearing, the court did not make any oral findings with respect to his actions or his criminal history but still found that he had neglected M.W. in its subsequent written order. He, thus, argues that, because the oral findings control, and there were no oral findings that he neglected M.W., the conflict should be resolved by concluding that the trial court did not find that he inflicted the neglect.

¶ 39   At the time of the adjudicatory hearing, John W. was in jail after being arrested for unlawful use or possession of a weapon by a felon, aggravated assault with use of a deadly weapon, and endangering the life or health of a child. The evidence presented specifically with regard to John W. indicated that he had previous convictions for violent crimes and had threatened physical violence against the caseworker assigned to this case. During the incident with the caseworker, he referenced his previous gang affiliations and being stabbed on the streets. After hearing this evidence, along with the other evidence about Dawn P.'s history with DCFS, her mental health issues, and the parents not being prepared for the baby's arrival, the court found that Dawn P. and John W. had neglected M.W. Considering the totality of the evidence, we find that the trial court's finding of neglect based on an injurious environment was not against the manifest weight of the evidence.

¶ 40   In making this decision, we note that John W. is correct that, when a trial court's oral pronouncement is in conflict with its written order, the oral pronouncement prevails. See *In re K.L.S-P.*, 383 Ill. App. 3d 287, 294 (2008). However, we find that there was no conflict here

14

between the oral and written findings where the court merely focused on Dawn P. when making its oral findings.

¶ 41        III. CONCLUSION

¶ 42 For the foregoing reasons, we affirm the circuit court of Fayette County's order adjudicating the minor as neglected.

¶ 43 Affirmed.