2020 IL App (1st) 200565-U
Order filed October 30, 2020

FIRST DISTRICT
FIFTH DIVISION

Nos. 1-20-0565

NOTICE: This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| *In re* A.W., a Minor, | ) | Appeal from the |
| | ) | Circuit Court of |
| (People of the State of Illinois, | ) | Cook County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | No. 18 JA 001069 |
| v. | ) | |
| | ) | |
| Mercedes L., | ) | Honorable |
| | ) | Andrea Buford, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

JUSTICE ROCHFORD delivered the judgment of the court.
Justices Hoffman and Cunningham concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The circuit court's findings of abuse due to physical injury and a substantial risk of physical injury were not against the manifest weight of the evidence.

¶ 2    Respondent-appellant, Mercedes L. (the mother), appeals from an adjudication order finding that her daughter, A.W., born on February 26, 2003, was abused and neglected. On appeal,

the mother challenges only the findings of abuse; the mother does not challenge the finding of neglect and does not challenge the dispositional order. We affirm.[1]

¶ 3    The Department of Children and Family Services (DCFS) took A.W., born on February 26, 2003, into protective custody on November 2, 2018. On November 5, 2018, the State filed a petition for adjudication of wardship of A.W. (petition), naming the mother and A.W.'s father, Jerry W. (the father), as respondents. The father is not a party to this appeal.

¶ 4    The State contended that A.W. had been neglected or abused, under the Juvenile Court Act of 1987 (Act) (705 ILCS 405/1-1 *et seq.* (West 2018)), in that her environment was injurious to her welfare (705 ILCS 405/2-3(1)(b) (West 2018)), she had suffered physical injury (705 ILCS 405/2-3(2)(i) (West 2018)), or had been placed in a situation which created a substantial risk of physical injury (705 ILCS 405/2-3(2)(ii) (West 2018)). The petition alleged that the mother had "five prior indicated reports for cuts, bruises, welts, abrasions, oral injuries, and substantial risk of physical injury/environment injurious to health/welfare by abuse." In September 2018, after the mother and A.W. had a physical altercation, the mother sent A.W. to live with a relative. On September 25, 2018, A.W. was bitten during an altercation with that relative. The mother gave conflicting statements as to whether A.W. could then return home. A.W. was fearful to return home.

¶ 5    At the same time, the State moved for temporary custody and in support filed the affidavit of Theresa Metcalfe, an investigator for DCFS. The affidavit revealed that A.W. was taken to a police station pursuant to a missing person's report. A.W. "accused her mom of being emotionally and physically abusive towards her for years." A.W. had not been living at home for the past two

---

[1] In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order stating with specificity why no substantial question is presented.

to three months, after an altercation with the mother. A.W. was first living with her godmother, but during her stay, A.W. was hospitalized twice after physical altercations. A.W. was placed with "another fictive kin." The mother had insisted that A.W. not return home but later said she could come home if she was taking medication. However, A.W. stated that she did not need medication and was fearful to return home.

¶ 6     The circuit court granted the motion for temporary custody, appointed the office of the Public Guardian as the guardian *ad litem* (GAL) for A.W., and appointed the office of the Cook County Public Defender as attorney for the mother.

¶ 7     An adjudication hearing was held on January 15, 2020.

¶ 8     Theresa Jackson, a child protection specialist for DCFS, testified that on September 25, 2018, she was assigned to investigate allegations of injuries to A.W., then 15 years old. Jackson spoke to A.W. at the Westlake Hospital (Westlake) emergency room. A.W. had scratches about her face; a one-inch gash behind her ear; a swollen bite mark on a finger; bruises on her face and arms; and a patch of missing hair from her head. Jackson answered in the affirmative when asked if A.W. looked like she had been in a fight. Jackson took pictures of A.W.'s injuries, which were admitted into evidence without objection.

¶ 9     A.W. told Jackson that her godmother, with whom she had been living for three weeks, had "been fighting and hitting her." According to A.W., an argument had begun a few days before, when the godmother had been drinking, and continued when A.W. was late from school the next day. The godmother was waiting in a car for A.W. and became verbally and physically aggressive. The godmother hit A.W., bit her finger, and pulled off her wig, taking a patch of her hair. A.W. jumped out of the car, ran away, and eventually encountered the police.

¶ 10     The police took A.W. to West Suburban Hospital (West Suburban). From there, the mother

drove A.W. to the godmother's house, even though A.W. told the mother that she did not want to return the godmother's care. On her return to the godmother's house, another argument ensued over whether A.W. would sleep in the bedroom or on the couch. The godmother pushed A.W. out of the bedroom and was hitting A.W. with a broom and "banging her head" in the kitchen. A.W. ran from the house without shoes or a shirt and ended up at Westlake.

¶ 11 After speaking with A.W., Jackson called the mother and told her that a safety plan for A.W. was necessary. The mother responded that A.W. should be with the godmother. After Jackson explained that A.W. could not go back to the godmother because of the altercations, the mother raised a question as to whether A.W. could be placed at a residential or group home. Other than the godmother, the mother was unaware of viable placement options for A.W. A.W. said that her parents did not want her and she would prefer to be in foster care.

¶ 12 Metcalfe, a former DCFS investigator assigned to A.W.'s case, testified that there were concurrent investigations involving A.W.: an "A sequence" regarding the godmother and an "N sequence" regarding the mother.[2] The A sequence was indicated and the N sequence was unfounded.

¶ 13 On September 25, 2018, Metcalfe spoke separately with the mother and the father by telephone. The mother said that she had given guardianship of A.W. to the godmother by letter. The mother was pregnant and did not want A.W. to live with her; A.W. had recently jumped on her. The father also said that A.W. could not stay with him.

---

[2] According to the DCFS Procedural Manual for Reports of Child Abuse and Neglect (Manual), each report of a new incident involving the same family unit, "*i.e.* one previously reported adult and at least one previously reported child," receives a new letter sequence, starting with the letter "A" and then "B," "C," etc., added to the same State Central Register number. DCFS Procedure Manual § 300.30(h) (Updated Oct. 9, 2015). This court may take judicial notice of the Manual as it is a public record. See *Dietz v. Property Tax Appeal Board*, 191 Ill. App. 3d 468, 477 (1989) (judicial notice taken of the Illinois Real Property Appraisal Manual, which was issued by the Department of Revenue, as a public record).

¶ 14    Metcalfe spoke to the mother again on September 27, 2018. The mother acknowledged observing a scratch on A.W.'s arm, a swollen finger, and a patch of hair missing from A.W.'s head, when she brought A.W. back to the godmother's house from the hospital. When asked specifically as to injuries to A.W.'s face, the mother said she was not wearing her glasses and did not see any facial injuries. According to the mother, A.W. pulled out her own hair.

¶ 15    Metcalfe took protective custody of A.W. "because there seemed to be no resolve for her returning home. There was a lot of conflict between [A.W.] and [the mother], and [A.W.] did not feel safe going back to that environment." The mother's prior "significant" DCFS history was also considered as a factor.

¶ 16    Metcalfe prepared an outline of A.W"'s cases dating back to 2009, which was admitted into evidence. A summary of that outline follows. On March 31, 2009, when A.W. was six, A.W. had a nickel-sized bruise/red mark near the corner of her left eye and a "very red" dime-sized mark on her neck. A.W. said the mother hit her on the head with a belt, hand, and fist, and shoved her into a wall. A few days later, A.W. had "a bruise on her ear, cheek, legs, and a scratch on her cheek and neck. A.W. said the mother was very mad and hit her with a belt on her legs, choked her, and grabbed her by the ear." The investigation resulted in an indicated report against the mother for cuts, bruises, welts, abrasions, and oral injuries to A.W.

¶ 17    On May 2, 2009, A.W. had a bruise on her stomach and above her eye and a knot on her head. A.W. was complaining of pain and taken to the hospital. A.W. stated that the mother kicked, hit, and choked her and told A.W. that "she's going to kill her." The emergency room doctor's notes revealed that the injuries on A.W.'s stomach were the result of child abuse. The mother was indicated for cuts, welts, abrasions, and oral injures to A.W. and substantial risk of injury/environment injurious to Dwayne Jr., A.W.'s half sibling.

¶ 18     On February 1, 2012, A.W., 9 years old, went to school with a fresh bruise, three-quarters of an inch long, on her left cheek bone. A.W. said the mother hit her hard on January 31, 2012. On that day, the mother had picked A.W. up early from school because A.W. had a sore throat. It was noted that A.W. had an emotional disorder. The mother was indicated for cuts, bruises, welts, abrasions, and oral injuries.

¶ 19     On or about December 20, 2016, A.W., 13 years old, was taken to a hospital after running away from home. A.W. reported that since the age of 7, she had been verbally and physically abused by the mother, who would beat and punch A.W. in the face. The mother also abused A.W.'s 8-year-old bother. A.W. had bruises on her forehead and arm and a scratch on her cheek. A.W. reported that the injuries were caused by the mother and that she had previously been sent to live with an aunt in Nebraska and wanted to return there. A.W. was transferred to Hartgrove Hospital (Hartgrove), where she was diagnosed with ADHD and intermittent explosive disorder and prescribed medication. The mother was indicated for cuts, welts, abrasions, and oral injures.

¶ 20     On October 15, 2018, after the incidents with the godmother, A.W. reported that the mother had been emotionally and physically abusive toward her for many years. At the time the outline was drafted, there was a pending investigation against the godmother; she was later indicated.

¶ 21     The mother cross-examined Metcalfe and recalled her as a witness. Metcalfe elaborated on her conversations with the father and the mother on September 25 and 27. The father said that A.W. was out of control. The mother reported that A.W. had been diagnosed with intermittent explosive disorder, did not take her medicine, and had been hospitalized three times. The issues with A.W. began when she was about 9 years old and had become worse. The mother had tried placing A.W. with different relatives, but there were conflicts and other problems, including physical altercations and damage to property and A.W. would be forced to leave. Eventually, the

6

mother had agreed to pay the godmother $450 to take care of A.W. and provide for her needs. The mother said it was a "hard" decision as to whether she would allow A.W. to come home after the incidents with the godmother because A.W. "pushed the envelope." The mother was fearful that she could lose custody of her other children or be forced to move because A.W. did not get along with the mother's landlord.

¶ 22    Shortly thereafter, DCFS did not know where A.W. was living. Beginning on October 4, 2018, the mother told Metcalfe several times that A.W. could come home. A.W. was located and found living with Dwayne Ford, the father of A.W.'s brother, and his fiancée. At that time, A.W. said she was not fearful of returning home but refused to do so.

¶ 23    Avril Riley, a former DCFS investigator, testified that she met with A.W., on December 21, 2016, at Hartgrove. A.W. reported several past physical altercations with the mother and that the mother said hurtful things to her, such as "I hate you." On December 20, 2016, the mother slammed A.W.'s head on the stove in the kitchen. A.W. fell to the ground and the mother "smacked" her on the face. The mother shoved a rag in A.W.'s face and called her worthless. A.W. injuries included scratches on her face, eye, and neck; a bruise under her eyebrow; an injury to her lower lip; and an injury to her pinky finger, which she said were caused by the mother. The mother called A.W. a failure and made fun of her teeth being crooked. A.W. was afraid to go home. Riley indicated the mother for "cuts, welts, and bruises." Intact services were recommended.

¶ 24    A.W.'s Westlake records, were admitted into evidence at the request of the State. These records revealed that A.W. was admitted to Westlake on May 11, 2018 "for aggressive behavior after getting into an argument with her mother." A.W., whose condition was stable, was transferred to Hartgrove for "psychiatric evaluation." Triage notes from Westlake indicate she remained at Hartgrove from May 11 to May 21. On May 31, 2018, A.W. was brought, again, to Westlake due

to an argument with the mother. A.W. was visibly upset and told hospital staff she had stopped medication a week before. She was discharged to the mother.

¶ 25    On September 25, 2018, A.W. was admitted to Westlake and diagnosed with multiple contusions and abrasions, and paronychia. An exam note stated that A.W. suffered from "multiple bruises due to domestic violence" and that she was well known to the ambulance crew due to prior instances of domestic violence, and DCFS, and police involvement.

¶ 26    The mother testified that, in August 2018, she found another place for A.W. to live, after A.W. had kicked the mother's stomach while the mother was pregnant. About five minutes after this incident, the mother took an eight second video, which was played during the proceedings. However, the video was not admitted into evidence.

¶ 27    At the request of the mother, A.W.'s Hartgrove records relating to a 10-day hospitalization in May 2018 were admitted into evidence. According to the discharge summary, A.W. was diagnosed with disruptive mood dysregulation disorder. The hospitalization notes revealed that A.W.'s problems included a risk of harm to others and trauma-related symptoms. She was prescribed multiple medications and was to engage in individual and group therapy. A.W.'s progress report noted that she was depressed. By May 21, she was "doing much better" and was discharged to her mother. A.W. was referred to outpatient services through Hargrove and her guardian was encouraged to participate for continued support.

¶ 28    The court orally, and later in a written order, found that A.W. was neglected based on an injurious environment, and abused based on physical abuse and a substantial risk of injury. In its oral remarks, the court observed that A.W. and "the mother have a very toxic relationship." A.W. had reported past incidents of physical and mental abuse by the mother and had "described an unstable home environment with the mother." The court also found that "the mother has at least

five indicated reports for cuts, welts, and bruises" and had returned A.W. to the godmother after being physically abused by the godmother despite A.W.'s protestations that she did not want to return.

¶ 29    The mother filed a motion to reconsider the adjudication order, which was later amended. The court denied the motion and proceeded to a dispositional hearing.

¶ 30    Andris Wofford, an adolescent foster care manager with Child Link, testified that in October 2019, he was assigned to A.W.'s case. In July 2019, A.W. had been placed in a home with Catherine Williams, a fictive kin, which was safe and appropriate.

¶ 31    However, there were three unusual incidents. A.W. had a case in juvenile court based on a November 2019 arrest at Water Tower Place after she was involved in an altercation with several police officers. Wofford did not know if the case had been resolved. In January 2020, A.W. was assaulted by her boyfriend and was injured. The agency referred A.W. for domestic violence services and discussed her risks of remaining in the relationship. In February 2020, A.W. was suspended from school after an altercation with another student.

¶ 32    A.W. has special needs. She has diagnoses of ADHD, PTSD, and intermittent explosive disorder. She is not prescribed medication and does not take any. A.W. was involved with the care coordinator at Lurie's Children's Hospital and continues to be engaged in and making progress in individual therapy. Due to attendance issues, she was recently discharged from individual trauma-based therapy. Child Link was in the process of getting A.W. assigned to a psychiatrist.

¶ 33    A.W. attends an alternative high school and was taking steps to obtain an IEP. However, after the February incident, the principal indicated that he wanted A.W. transferred out of the school.

¶ 34    The mother had not been assessed for services as she did not make herself available to the

caseworker and screener. According to Wofford, the mother "does not wish to have [A.W.] returned to her care, so she is not engaged in any services." A.W. does not wish to return home to the mother.

¶ 35    Wofford recommended that A.W. be adjudged a ward of the court.

¶ 36    The court adjudged A.W. a ward of the court and found that the mother and father were unable and unwilling to care for A.W. The court entered a permanency goal of substitute care pending independence for A.W. noting that she continues to need services.

¶ 37    The court denied the mother's renewed motion for reconsideration of the adjudication order. The mother timely appealed.

¶ 38    As previously stated, on appeal, the mother challenges only the circuit court's findings that A.W. was abused under both section 2-3(2)(i) and section 2-3(2)(ii) of the Act; the mother does not challenge the finding of neglect and does not challenge the dispositional order.

¶ 39    The Act provides a "step by step" process for deciding whether a child should be removed from his or her parents, made a ward of the court, and whether parental rights should be terminated. *In re Arthur H.*, 212 Ill. 2d 441, 462 (2004). In all stages, the court's main concern is the best interest of the minor. *In re K.G.*, 288 Ill. App. 3d at 734-35 (1997). After a petition for wardship has been filed, the circuit court is to determine whether the minor was abused or neglected. *In re Audrey B.*, 2015 IL App (1st) 142909, ¶ 31. The State has the burden to prove, by a preponderance of the evidence, that the minor was abused or neglected. *Id.* ¶ 32. More specifically, the State must prove that the allegations are more probably true than not. *In re N.B.*, 191 Ill. 2d 338, 343 (2000). The purpose of the adjudication hearing is to determine whether the minor has been abused and not whether the parent was the abuser. *Audrey B.*, 2015 IL App 1st 142909, ¶ 32.

¶ 40 Cases adjudicating wardship based on allegations of abuse "are *sui generis* and must be decided on the basis of their unique circumstances." *Arthur H.*, 212 Ill. 2d at 463. The trier of fact is afforded broad discretion in determining the existence of abuse. *In re Jaber W.*, 344 Ill. App. 3d 250, 258 (2003). The circuit court "is in the best position to determine the credibility and weight of the witnesses' testimony as it has the best opportunity to observe the demeanor and conduct of the parties and witnesses." *Id.* at 258 (citing *In re E.S.*, 324 Ill. App. 3d 661, 667 (2001)). On review, we will not disturb the circuit court's determinations unless they are against the manifest weight of the evidence. *Arthur H.*, 212 Ill. 2d at 464. A determination is against the manifest weight of the evidence where the opposite conclusion is clearly apparent. *In re D.F.*, 201 Ill. 2d 476, 498 (2002).

¶ 41 The circuit court's findings that A.W. was abused were made pursuant to sections 2-3(2)(i) and 2-3(2)(ii) of the Act. The relevant portions of those sections state that those who are abused include any minor whose parent or other person responsible for her welfare:

"(i) inflicts, causes to be inflicted, or allows to be inflicted upon such minor physical injury, by other than accidental means, which causes death, disfigurement, impairment of physical or emotional health, or loss or impairment of any bodily function; [or]

(ii) creates substantial risk of physical injury to such minor by other than accidental means which would be likely to cause death, disfigurement, impairment of emotional health, or loss of impairment of any bodily function ***." 705 ILCS 405/2-3(2)(i), (ii).

Under the Act, a *prima facie* showing of abuse may be established by "proof of injuries sustained by a minor or the condition of a minor of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent, custodial or guardian of such minor." 705 ILCS 405/2-18(2)(e) (West 2018).

¶ 42    Here the circuit court's findings of abuse were not against the manifest weight of the evidence. In reaching these conclusions, the court properly considered the totality of the evidence including A.W.'s history of physical injuries and the reports of physical and emotional abuse by the mother and the godmother. See *In re J.P.*, 331 Ill. App. 3d 220, 237 (abuse finding affirmed based on the totality of the evidence); *In re A.W.*, 231 Ill. 2d 241, 261 (2008) (neglect finding affirmed based on the totality of the evidence).

¶ 43    The evidence demonstrates that A.W., over a period of nine years, suffered physical and emotional injuries documented in her medical history and the indicated reports. 705 ILCS 405/2-18(4)(b) (West 2018) ("[a]ny indicated report filed pursuant to the Abused and Neglected Child Reporting Act shall be admissible into evidence"). These injuries included bruises and scratches on her ears, face, neck, stomach, legs, and arms. The records show that A.W. reported that during the various incidents, the mother hit A.W. on the head with a belt, hand, and fist; shoved A.W. into a wall, kicked her; choked her; and said she was going to kill her. After one particular incident in 2016, Riley observed A.W. at Hartgrove and testified that she had numerous visible injures to her face including a bruise on her forehead, which corroborated A.W.'s account at that time the mother slammed her head during an argument. The evidence also shows that A.W. was emotionally abused where the mother said hurtful things to her, such as "I hate you," shoved a rag in A.W.'s face and called her worthless, called A.W. a failure, and made fun of A.W.'s appearance.

¶ 44    During the most recent incident, Jackson observed A.W. at Westlake with multiple injuries. A.W. had scratches about her face; a one-inch gash behind her ear; a swollen bite mark on a finger; bruises on her face and arms; and a patch of missing hair from her head. These injuries were consistent with A.W.'s medical records and corroborated A.W.'s statements that the godmother, hit her, bit her finger, and pulled off her wig, taking a patch of hair off of her head. Although the

mother was not directly involved in these specific instances of physical abuse, the mother allowed it to happen. The mother had given guardianship of A.W. to the godmother and washed her hands of any responsibility for A.W.'s "needs." And despite observing injuries to A.W. and over A.W.'s protestations, the mother took A.W. back to the godmother's home from West Suburban. Shortly thereafter, A.W. was at Westlake after the godmother pushed A.W. out of the bedroom and was hitting A.W. with a broom and "banging her head" in the kitchen. The mother ignored that A.W. had suffered substantial harm at the hands of the godmother and put A.W. right back into a dangerous situation where abuse was likely to (and did) occur.

¶ 45    The mother concedes that A.W. sustained injuries and does not contend that the injuries were accidental. Her argument is that A.W.'s injuries were not of such gravity as would qualify to support a finding of abuse under the Act. In making this argument, the mother appears to rely on the references in sections 2-3(2)(i) and 2-3(2)(ii) to "death," "disfigurement," "physical impairment," and loss or impairment of bodily function." However, those sections also define abuse as injuries, which cause "impairment of emotion health." See *In re A.S.*, 2020 IL App (1st) 200560, ¶ 35. The evidence shows that A.W. was mistreated and subjected to dehumanizing beatings and other aggressiveness by the mother and the godmother. She was called names and belittled. The manifest weight of the evidence supports a conclusion that A.W.'s injuries, both physical and mental, caused an impairment of her emotional health and findings that she was abused under sections 2-3(2)(i) and 2-3(2)(ii). See *In re R.G.*, 2012 IL App (1st) 120193, ¶ 42 (citing *In re F.S.*, 347 Ill. App. 3d at 66) (finding that the same evidence that supports the physical abuse finding also supports the trial court's finding that the State proved by a preponderance of the evidence that the minor was abused due to a substantial risk of physical injury).

¶ 46    In so concluding, we reject the mother's argument that the hospitals where A.W. was treated would not have discharged A.W. and allowed her to leave with the mother if her injuries rose to the level of abuse as defined by the Act. We similarly reject the mother's argument that there was no abuse under the Act because in prior indicated incidents, A.W. was not removed from her care. First, a hospitalization is not a prerequisite for a finding of abuse. *In re F.S.*, 347 Ill. App. 3d 55, 65 (2004). Further, the circuit court's findings of abuse were based on the totality of the evidence and the long history of the mother's abusive conduct which resulted in numerous physical and mental injuries.

¶ 47    As such, the circuit court's findings that the State met its burden of proving A.W. was abused due to physical injuries and a substantial risk of injury were not against the manifest weight of the evidence.

¶ 48    Because the mother has not challenged them on appeal, the mother has forfeited review of the circuit court's finding of neglect and the dispositional order. Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018).

¶ 49    For the reasons stated, we hold that the circuit court's findings of abuse and neglect were supported by the manifest weight of the evidence and affirm the adjudication and dispositional orders.

¶ 50    Affirmed.