2025 IL App (1st) 250617

No. 1-25-0617

Opinion filed December 17, 2025

Third Division

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | |
|---|---|
| *In re* A.W.-B., ) | |
| ) | |
| Minor-Appellee, ) | Appeal from the |
| ) | Circuit Court of |
| (The People of the State of Illinois, ) | Cook County. |
| ) | |
| Petitioner-Appellee, ) | No. 24 JA 476 |
| ) | |
| v. ) | Honorable Lisa M. Taylor, |
| ) | Judge, presiding. |
| C.W., ) | |
| Respondent-Appellant). ) | |

_____

JUSTICE LAMPKIN delivered the judgment of the court, with opinion.
Presiding Justice Martin and Justice Rochford concurred in the judgment and opinion.

**OPINION**

¶ 1     This appeal arises out of proceedings to adjudicate wardship of respondent C.W.'s minor

daughter, A.W.-B., under the Juvenile Court Act of 1987 (Act) (705 ILCS 405/1-1 *et seq.* (West

2024)). On January 27, 2025, the trial court found that A.W.-B. was abused or neglected as defined

by the Act and, following a disposition hearing, subsequently ordered that A.W.-B. be placed in

the guardianship of the Department of Children and Family Services (DCFS). Respondent now contends on appeal that the State failed to meet the requisite burden of proof for abuse and neglect.

¶ 2     For the reasons that follow, we affirm the judgment of the trial court.[1]

¶ 3                                    I. BACKGROUND

¶ 4     On July 5, 2024, the State filed a petition for adjudication of wardship of A.W.-B., which alleged that A.W.-B. was neglected and abused. Specifically, the State claimed that respondent presented to the emergency room on June 27, 2024, with A.W.-B. after A.W.-B. "reported that she allowed two neighbors into the home to sexually assault her while [respondent] slept." The State further alleged that on July 2, 2024, respondent again brought A.W.-B. to the emergency room after A.W.-B. reported she had been sexually assaulted during a forensic interview the previous day. Additionally, the State alleged that respondent previously filed police reports dating back to September 2021 with claims that A.W.-B. was sexually abused by her putative father,[2] two uncles, two grandfathers, a coach, and her therapist and that respondent further claimed that A.W.-B. was sexually abused during a psychiatric hospitalization.

¶ 5     The same day, the trial court entered a temporary custody order placing A.W.-B. in the custody of DCFS. The matter proceeded to a hearing on January 27, 2025, and the following is a summary of the pertinent testimony adduced at that hearing.

---

[1] In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

[2] The trial court entered a default order against A. W-B.'s putative father, C.B., on December 9, 2024, and C.B. is not a party to this appeal.

¶ 6 Tessa Greb, a forensic interviewer for the Our Children's Advocacy Center in Justice, Illinois, testified that she conducted a forensic interview with A.W.-B. on July 1, 2024. Respondent and her advocate were present when she initially met A.W.-B.

¶ 7 Greb explained that the interview room has cameras to record interviews, but those cameras must be activated from an attached observation room. A person in the interview room cannot stop the recording or unplug the cameras or microphones because the cables are embedded in the wall. In practice, she would activate the recording system in the observation room, then bring a child into the interview room and conduct the interview. While the observation room does not have a direct line of sight to the interview room, there is a television connected to the live video feed from the interview room.

¶ 8 On the day that Greb interviewed A.W.-B., she turned on the recording equipment before bringing A.W.-B. to the interview room. A police officer and a DCFS employee were in the observation room, but Greb claimed they had no ability to terminate the recording.

¶ 9 Greb testified that prior to the interview, A.W.-B. was crying and it took 45 minutes to calm her down enough to perform the interview. Greb noted that respondent was "extremely convincing and not considerate of [A.W.-B.'s] feelings in that moment," as she tried to persuade A.W.-B. to participate in the interview.

¶ 10 After conducting the interview, Greb took A.W.-B. back to the waiting area where respondent was waiting, and then she went to the observation room and stopped the recording. According to Greb, the door of the interview room could be seen from the lobby, and Greb was never alone with A.W.-B. other than while conducting the recorded interview. Greb later reviewed

the interview recording and determined that the recording never stopped and captured the entire interview.

¶ 11 Milachelle Price, a DCFS investigator, testified that she met with A.W.-B. on July 2, 2024, at Lutheran General Hospital. A.W.-B. was 10 years old at the time. Respondent initially left the room when Price met with A.W.-B. Respondent was still visible outside the room, and at one point respondent interrupted, and Price was unable to have a private conversation with A.W.-B. for the remainder of the interview. During the interview, A.W.-B. stated that she felt safe only with her mother and that she did not feel safe around her grandfather and grandmother. Following the interview, Price spoke with respondent alone. Respondent "reported that her daughter has sexualized behavior" and that respondent's mother and father have sexually exploited A.W.-B. since she was three years old. Respondent stated that she suffered from posttraumatic stress disorder (PTSD) and anxiety as a result of what had been happening to A.W.-B. since she was three years old.

¶ 12 According to respondent, A.W.-B. claimed that the previous day, after the cameras were turned off, A.W.-B. asked the forensic interviewer if A.W.-B. could lick the interviewer's "private area" and that the interviewer allowed her to do so. Respondent also told Price that A.W.-B. had several rape kits performed and that respondent was told it could take eight months to a year to get the results. Neither A.W.-B. nor respondent were receiving any mental health treatment at the time.

¶ 13 Respondent informed Price she intended to bring A.W.-B. back to the hospital for similar future concerns. Price expressed her concern about respondent subjecting A.W.-B. to repeated rape kits despite not having the results of the first tests that were administered. Furthermore, Price was concerned that A.W.-B. was not engaged in any mental health treatment.

¶ 14    During cross-examination by respondent's counsel, Price admitted that respondent never claimed that she saw any sexual activity between A.W.-B. and the forensic interviewer; she was simply reporting what A.W.-B. told her.

¶ 15    Khalia Ross, a child protection advance specialist for DCFS, testified that she was assigned to multiple investigations regarding A.W.-B. On June 27, 2024, Ross went to Comer Children's Hospital to meet with A.W.-B. and respondent following an allegation that two neighbors were sexually abusing A.W.-B.

¶ 16    Respondent told Ross that she went to sleep around 9 p.m. on June 26, 2024, and when she woke up, she noticed that cameras she had set up in the home were unplugged. A.W.-B. then told her mother that two of the neighbors came into the home and sexually assaulted A.W.-B. while respondent slept. According to Ross, respondent stated that A.W.-B. previously reported to respondent on June 20, 2024, that she had been sexually assaulted by their neighbors for the past two years. Following that claim, respondent installed a deadbolt on the door and cameras inside the home. Ross testified that she discussed police involvement with respondent and that she knew respondent called the police on June 26, 2024, but she did not know any further details.

¶ 17    Ross then participated in a meeting with A.W.-B. and a synergy evaluator,[3] where the synergy evaluator was performing the interview. During that interview, A.W.-B. stated that on June 26, 2024, one of her neighbors entered through the garage and sexually assaulted her. Then, approximately an hour later, a second neighbor entered the house and sexually assaulted her. A.W.-B. also claimed she had previously been sexually assaulted by her grandfather in the past and by multiple staff at Riveredge Hospital.

---

[3]The hearing testimony did not provide any explanation for this term.

¶ 18    In response to a question about who she could trust, A.W.-B. stated she only trusted her mother and God. A.W.-B. had been receiving therapy, but she stopped several weeks earlier for unknown reasons. She also expressed feeling sad because she had no one else to talk to other than her mother and that sometimes she felt like a hostage.

¶ 19    At some point during A.W.-B.'s hospital stay, Ross had a second conversation with respondent in which respondent was recording the conversation and broadcasting it live. Ross informed respondent she did not feel comfortable being recorded, and in response, respondent became irate and began using profanity. Respondent refused to cease recording and Ross left the room.

¶ 20    On July 1, 2024, Ross was present for the forensic interview in Justice, Illinois. Ross watched the interview alongside a police officer from the observation room on the closed circuit television. Ross was present for the entire interview, and the audio/video feed never went out during the time she was observing. She did not observe anything inappropriate during or after the interview.

¶ 21    The following day, Ross became aware that respondent took A.W.-B. to Lutheran General Hospital and was concerned that A.W.-B. was making allegations that Ross knew to be untrue and that A.W.-B. was once again being subjected to an invasive sexual assault examination.

¶ 22    On July 3, 2024, Ross called respondent to inform her that DCFS was going to take protective custody of A.W.-B. Respondent informed her that she did not have any immediate placement options for A.W.-B., and that A.W.-B. could not be placed with her father because her father was one of her past abusers.

¶ 23    On July 5, 2024, Ross spoke with respondent again, and respondent stated that A.W.-B. had been diagnosed with PTSD, but respondent did not believe it was true because the person who made the diagnosis also sexually abused A.W.-B.

¶ 24    Ross further testified that as part of her investigation, she performed a Law Enforcement Agencies Data System search and determined that there were 18 total investigations regarding A.W.-B. since 2021. Only two of those investigations, those related to the alleged incidents in June and July of 2024, were "indicated."[4] Ross stated that the reason for the June 2024 investigation was inadequate supervision, citing the fact that respondent was not taking appropriate measures to supervise A.W.-B. if people were getting inside the home.

¶ 25    Ross cited "substantial risk" as the reason for her July 2, 2024, investigation, explaining that "[respondent] continued to skip around to different hospitals trying to obtain sexual assault kits for [A.W.-B.], and it was no [*sic*] reasonable measures to show that she had even been sexually assaulted from the previous SANE exam so she was continuing to put her at risk." When asked to explain the risk, Ross stated that she believed A.W.-B. was at risk both physically and mentally because A.W.-B. had undergone eight sexual assault physical examinations in a one-year period, and she had spoken to physicians who informed her that the examinations were very invasive.

¶ 26    Following Ross's testimony, the State admitted into evidence, without objection, approximately 4,000 pages of medical records from a number of sources including Christ Children's Hospital, Riveredge Hospital, Comer Hospital, Palos Community Hospital, and Lutheran General Hospital. While we have elected not to summarize these records at length,

---

[4]An "indicated report" means a report made under the Abused and Neglected Child Reporting Act if an investigation determines that credible evidence of the alleged abuse or neglect exists. 325 ILCS 5/3 (West 2024).

particularly because many of them deal with events entirely unrelated to the facts of this case, such as when A.W.-B. had surgery on her left ear as an infant, we discuss portions of them below as needed for our disposition. Neither counsel for A.W.-B. nor respondent presented any evidence.

¶ 27    As to the trial court's ruling, we recite the relevant portions verbatim. First, the trial court addressed the credibility of the State's witnesses:

"Ms. Greb, Ms. Price, and Ms. Ross were all extremely credible. Ms. Price was in her vehicle testifying. Ms. Ross got a little frustrated that we wouldn't let her cheat and look at her papers, but she did a phenomenal job in testifying even with some technological challenges. Ms. Greb I have to say during the course of the examination and looking at the allegations that were in the record, I think she handled that situation with grace and was just extremely credible. This is a very unfortunate case."

¶ 28    Next, the trial court addressed defense counsel's argument that respondent was taking action to protect her daughter in response to A.W.-B.'s allegations:

"Because I appreciate [defense counsel's] arguments that [respondent] have [*sic*] to take some actions if her daughter is saying these things, but I must confess to you good people, I watched Ms. Greb's face on the video and some of the verbiage this young lady used that appeared coached to the Court so I just have to put that on the record."

¶ 29    Then, after the trial court announced that the State had met its burden of proof to show that A.W.-B. was abused and neglected, the trial court provided its specific reasoning:

"This is because of [respondent's] action in taking the child for these invasive examinations and if assuming they are true, failing to take action to make sure that she was in a safe

environment and so I am finding in this particular instance, that [respondent] is the perpetrator of the abuse and neglect to this young lady."

¶ 30    The trial court's January 27, 2025, written order specified that it found A.W.-B. neglected on the basis of a lack of care and being subjected to an injurious environment and abused on the basis that respondent created a substantial risk of physical injury to A.W.-B. See 705 ILCS 405/2-3(1)(a), (b), (2)(ii) (West 2024). Below the form order's checked boxes, the order read: "because based on the credible testimony of all three witnesses, the minor's testimony as it was presented through the forensic interview, which appeared coached based on some of the minor's verbiage, and the abuse or neglect of the minor and the extensive medical records."

¶ 31    On March 5, 2025, the trial court held a dispositional hearing. Jade Frazier, a treatment coordinator for the National Youth Advocate Program, was the only witness. She had been assigned A.W.-B.'s case from DCFS because her agency was able to provide the specialized services that A.W.-B. needed. At the time of the hearing, A.W.-B. had just turned 11 years old, and she was living in a specialized foster home where she had been since November 2024.

¶ 32    Frazier reported that A.W.-B. was doing well in school, but she was struggling to make friends. A.W.-B. was attending weekly sexual abuse therapy sessions, and respondent was also attending individual therapy sessions. Frazier opined that A.W.-B. was making progress and doing well, but recommended that DCFS be appointed A.W.-B.'s guardian for the time being. However, Frazier also recommended a goal of returning A.W.-B. to respondent within 12 months. Additionally, Frazier testified that respondent had been cooperative and willing to undertake all the necessary steps to regain custody of A.W.-B.

¶ 33 The trial court ruled that A.W.-B. should be placed in the custody of DCFS with the added goal of returning A.W.-B. home within 12 months. Respondent filed a notice of appeal on April 4, 2025, and this appeal followed.

¶ 34                                     II. ANALYSIS

¶ 35 On appeal, respondent raises only one argument: that the State failed to meet its burden of proof necessary to find that A.W.-B. was abused or neglected.

¶ 36 The Act provides a step-by-step framework for determining whether a child should be removed from his or her parents and made a ward of the court. Proceedings begin upon the filing of a petition for wardship by the State, at which time the trial court must hold a temporary custody hearing to determine whether there is probable cause to believe that the child is neglected, whether there is an immediate and urgent necessity to remove the child from the home, and whether reasonable efforts have been made to prevent the removal of the child or that no efforts reasonably can be made to prevent or eliminate the necessity of removal. *Id.* § 2-10.

¶ 37 The trial court must then make a finding of abuse, neglect, or dependence before it conducts an adjudication of wardship. *Id.* § 2-21. The Act defines a "neglected minor" to include "any minor under 18 years of age *** whose environment is injurious to [his or her] welfare," as well as a minor who is not receiving the proper or necessary support, including medical care. *Id.* § 2-3(1)(a), (b). The Act also defines an "abused minor" to include those under the age of 18 who live in the same household as a parent, immediate family member, or person responsible for the minor's welfare, and that person creates a substantial risk of physical injury to such minor by other than accidental means that would be likely to cause death, disfigurement, impairment of emotional health, or loss of impairment of any bodily function. *Id.* § 2-3(2)(ii).

¶ 38 Generally, "neglect" is defined as the "failure to exercise the care that circumstances justly demand." (Internal quotation marks omitted.) *In re Arthur H.*, 212 Ill. 2d 441, 463 (2004). However, this term is not limited to a narrow definition and, instead, by necessity has a fluid meaning. *Id.* "[Neglect] embraces wilful as well as unintentional disregard of duty. It is not a term of fixed and measured meaning. It takes its content always from specific circumstances, and its meaning varies as the context of surrounding circumstances changes." (Internal quotation marks omitted.) *Id.*

¶ 39 Likewise, Illinois courts have recognized that the term "injurious environment" is an amorphous concept that cannot be defined with particularity. *Id.* In general, however, the term has been interpreted to include "the breach of a parent's duty to ensure a 'safe and nurturing shelter' for his or her children." (Internal quotation marks omitted.) *Id.* (quoting *In re N.B.*, 191 Ill. 2d 338, 346 (2000)). As a result, cases involving allegations of neglect and adjudication of wardship are *sui generis* and must be decided on the basis of their unique circumstances. *Id.* "This analytical principle underscores the 'fact-driven nature of neglect and injurious environment rulings.' " *Id.* (quoting *N.B.*, 191 Ill. 2d at 346). "In any proceeding initiated pursuant to the [Act], including an adjudication of wardship, the paramount consideration is the best interest of the child." (Internal quotation marks omitted.) *Id.* at 464.

¶ 40 A. Timeliness of this Decision

¶ 41 Before considering respondent's argument, we must first address the date of our decision and the accelerated nature of cases such as this. The matter at bar is subject to an expedited disposition pursuant to Illinois Supreme Court Rule 311(a) (eff. July 1, 2018). Paragraph (a)(5) of

Rule 311 requires us to issue our decision within 150 days after the filing of the notice of appeal, except where good cause is shown. Ill. S. Ct. R. 311(a)(5) (eff. July 1, 2018).

¶ 42    The trial court issued its final judgment in this case on March 5, 2025, and respondent's notice of appeal was filed on April 4, 2025. This means we would have been required to issue our decision by September 2, 2025.

¶ 43    The record in this case was filed on May 20, 2025, and respondent subsequently sought and received two extensions of time to file the appellant's brief, which was filed on July 23, 2025. The State and the Office of the Cook County Public Guardian also both sought and received two extensions of time before filing their briefs on September 29, 2025, and October 21, 2025, respectively. Respondent then sought and received an extension of time to file her reply brief, which was filed on October 31, 2025.

¶ 44    Under these circumstances, we find good cause for issuing our decision after the 150-day deadline contemplated by Rule 311(a)(5).

¶ 45                          B. Sufficiency of the Evidence

¶ 46    Our precedent instructs that a proceeding for adjudication of wardship "represents a significant intrusion into the sanctity of the family which should not be undertaken lightly." (Internal quotation marks omitted.) *Arthur H.*, 212 Ill. 2d at 463. It is with the gravity of these proceedings in mind that we consider whether the evidence, in the form of testimony and documentary evidence, was sufficient to find A.W.-B. abused or neglected.

¶ 47    The State must prove alleged abuse or neglect in a wardship petition by a preponderance of the evidence. *In re J.P.*, 331 Ill. App. 3d 220, 234 (2002). Preponderance of the evidence is that amount of evidence that leads a trier of fact to find that the fact at issue is more probable than not.

*Id.* A trial court's determination of a neglect or abuse issue is entitled to great deference and will not be disturbed on appeal unless contrary to the manifest weight of the evidence. *Id.* A finding is against the manifest weight of the evidence only if a review of the record clearly demonstrates that the opposite result is proper. *Id.*

¶ 48    Respondent claims that the State failed to provide sufficient proof that A.W.-B. was abused or neglected on the grounds of an injurious environment, lack of care, or a substantial risk of physical injury. In making her argument, she relies primarily on *In re A.P.*, 2012 IL 113875. We largely disagree with her argument and the comparison to *A.P.*

¶ 49    In *A.P.*, the trial court determined that the two minors at issue were neglected. *Id.* ¶ 1. The hearing testimony demonstrated that the respondent left her two children at home with her boyfriend while she attended an appointment. When she returned home, one of her children, A.P. had burns on his face, and the respondent took him to the emergency room. *Id.* ¶ 8. Medical records admitted into evidence showed that the respondent's boyfriend stated that A.P. was running for a toy, slipped, and fell headfirst into the bathtub. *Id.* ¶ 7. The records also documented prior hospital visits when A.P., for example, fell off a chair and cut his lip or ran into a desk drawer. *Id.*

¶ 50    The appellate court reversed, finding that the respondent had no previous reason to believe her boyfriend would act neglectfully and that the respondent's failure to provide a safe environment for A.P. was unintentional and not willful. *Id.* ¶ 12. The supreme court affirmed the appellate court's judgment, reasoning that one injury, which was immediately rectified by a trip to the emergency room, was not enough to establish neglect. *Id.* ¶ 26. But the case at bar is not one where there was only one instance of harm committed by someone other than respondent that she

could not foresee. Nor can we say that respondent's repeated actions in this case were unintentional or not willful.

¶ 51    As part of her argument, respondent asserts that there was no evidence introduced at the hearing to substantiate that A.W.-B. was ever in the presence of an "unsafe person." On that point, we agree, and thus respondent has identified the essence of the case against her. We begin with the trial court's neglect finding.

¶ 52    The record before us reflects that A.W.-B. has, either by her own statements or through respondent, made allegations of sexual abuse or sexual assault against a litany of people including her father, grandmother, grandfather, uncle, DCFS staff, law enforcement, therapist, gymnastics coach, and hospital staff at multiple hospitals. None of these, based on the record in this case, are substantiated. Furthermore, the allegations against Greb are completely refuted by the record.

¶ 53    While they are certainly not the entire picture, the medical records from June 24, 2024, through July 2, 2024, in conjunction with the testimony from the hearing and the forensic interview, are an instructive sample of the trauma to which respondent has subjected A.W.-B.

¶ 54    On June 24, 2024, A.W.-B. presented to the emergency room at Christ Children's Hospital with respondent. Respondent informed staff that A.W.-B. was sexually assaulted vaginally and anally by a neighbor and that the neighbor was able to enter the house while respondent slept because A.W.-B. gave the neighbor a spare key and the code to unlock the garage door. Respondent claimed that she had cameras facing every door in the house, "but someone turned them off." A.W.-B.'s physical examination noted no lacerations, bruising, abrasions, bites, swelling, or tenderness.

¶ 55    Respondent told hospital staff that she did not feel comfortable with A.W.-B. being questioned alone by DCFS employees because DCFS staff had sexually abused A.W.-B. in the past and feared they would do so again. Of course, these fears appeared to manifest only days later following A.W.-B.'s video-recorded interview on July 1, 2024. This hospital visit was also an occasion on which respondent informed hospital staff that A.W.-B. was sexually assaulted by multiple neighbors inside respondent's home on June 20 and June 21, 2024, after A.W.-B. let their neighbors into the home.

¶ 56    On June 27, 2024, respondent went to the emergency department at Palos Community Hospital with A.W.-B. where respondent reported that A.W.-B. had been letting neighbors in during the night who sexually assaulted A.W.-B. Respondent claimed that A.W.-B. let the neighbors in the previous night and that A.W.-B. was sexually assaulted again. According to respondent, the neighbors gained access to the home because A.W.-B. gave them a spare key and door codes and disabled the home's cameras. Respondent refused to go to Christ Children's Hospital because of a sexual assault that occurred there.

¶ 57    The same day, A.W.-B. was transferred to Comer Hospital where respondent informed staff that A.W.-B. has had 10 sexual assault examination kits performed in the past. Staff noted that "[respondent] has made multiple reports of sexual assault on behalf of her daughter against many people including her medical providers, neighbors, and family members. There is concern that [respondent] appears to have mental health issues as these alleged assaults may not be true and [respondent] has brought [A.W.-B.] into other medical facilities with the same complaint." Additionally, respondent claimed that A.W.-B. unplugs the security cameras respondent had set up, and therefore she had no evidence of the men entering the home. A.W.-B.'s physical

examination was negative for any signs of external trauma. Finally, the hospital notes indicated there were concerns that respondent was causing harm to A.W.-B. because A.W.-B. was being isolated from other support systems, including a therapist.

¶ 58    On July 1, 2024, A.W.-B. participated in her forensic interview with Greb. We have reviewed the recording of this interview and, as the hearing testimony indicated, no sexual acts transpired between A.W.-B. and Greb. We need not summarize the entirety of the video, primarily because what did not occur in the interview is far more pertinent to our review of this case than A.W.-B.'s statements regarding her neighbors.

¶ 59    However, there are a few aspects that warrant mention. First, at the beginning of the interview, upon being separated from respondent, A.W.-B. was exceptionally distressed and tearful. A.W.-B. stated she has no friends and was not currently going to school. However, as the interview progressed, A.W.-B.'s demeanor changed. At times, even while recounting the alleged sexual crimes against her, A.W.-B. exhibited such a level of cheerfulness and composure that it is understandable that the trial court believed that A.W.-B. was coached.

¶ 60    Furthermore, approximately one hour into the interview, A.W.-B. stated that two days prior to the forensic interview, respondent put locks on A.W.-B.'s bedroom door. Disconcertingly, A.W.-B. explained that the lock did not prevent people from getting into her room. Instead, it locked from the outside and prevented A.W.-B. from leaving her room. A.W.-B. then stated that respondent was a "good mommy, you know why? Because she always opens it every single day."

¶ 61    Then, on July 2, 2024, following A.W.-B.'s interview with Greb, respondent and A.W.-B. presented to Lutheran General Hospital with complaints that A.W.-B. was sexually abused during her forensic interview the previous day. Staff noted that A.W.-B. had seven emergency department

evaluations for sexual assault since December 2023, and that most if not all evaluations resulted in some form of evidence collection. They also noted the frequency of hospital visits was concerning for either human trafficking, malingering, or medical child abuse.

¶ 62    While the medical records admitted into evidence contain other similar emergency department visits with similar allegations and similar outcomes dating back to 2021, the above-referenced dates are enough to illustrate the problem. Between June 24, 2024, and July 2, 2024, respondent brought A.W.-B. to the emergency department of differing hospitals three times with concerns that A.W.-B. had been sexually assaulted in ways that were both improbable and unsubstantiated. Compounding this, the hearing testimony maintained that A.W.-B. stated she does not trust anyone but her mother and that she feels like a hostage in her own home. Indeed, it is easy to see why given A.W.-B.'s claim in the interview that respondent took the extraordinary step of locking her child in her bedroom.

¶ 63    While we do not minimize or dismiss a parent's vigilance in taking his or her child to the emergency room following allegations of sexual abuse or sexual assault, this case presents a very different issue. Given that nothing in the record substantiates any of these repeated and far-reaching allegations, the issue is instead the examination of the environment giving rise to them.

¶ 64    Respondent has repeatedly insisted on subjecting A.W.-B. to sexual assault examinations despite the entirely unsubstantiated nature of A.W.-B.'s allegations. At the hearing, Ross testified that respondent had eight such examinations performed on A.W.-B. in a one-year period. As noted by some of A.W.-B.'s medical records, these invasive examinations can result in significant stress and additional trauma. This is the harm the trial court identified as part of its ruling—respondent's

repeated act of subjecting her daughter to invasive, traumatic examinations that appear to be entirely unnecessary.

¶ 65    There is also the issue, as the Comer Hospital records noted, that respondent has isolated A.W.-B. from other support systems, including mental health treatment. At the time of the hearing, she was not receiving any therapy or counseling and had stopped three weeks earlier for unknown reasons.

¶ 66    Respondent acknowledged that A.W.-B. has been diagnosed with PTSD, however, respondent minimized that diagnosis, claiming it came from a therapist who sexually abused A.W.-B. Several months prior to the events of June and July 2024, A.W.-B. had a five-day admission to Riveredge Hospital, which provides some insight into the issues A.W.-B. faces. On February 16, 2024, A.W.-B. presented to the hospital with her mother, complaining of suicidal ideation with plans to stab herself in the chest. Respondent reported at the time that A.W.-B. fondled herself daily, once gave a male peer oral sex on a school bus, and told adults, "You can touch me, it's okay, I won't tell anyone." A.W.-B. was quoted as saying, "I have been sexually abused a lot and now I am sexually abusing others because I don't know any better."

¶ 67    During the course of her hospital admission, A.W.-B. reported an incident three days prior to her admission where "she saw her grandfather telling her to 'take off her clothes,' " despite the fact that her grandfather was not actually there at the time. A.W.-B. also reported sometimes hearing voices telling her to do sexually explicit things and at the time of her admission stated she was seeing visual hallucinations of a man sitting in the corner. Respondent informed hospital staff that A.W.-B. had been experiencing suicidal ideation for one week, but that with the help of "the blood of Jesus Christ," A.W.-B. would be okay. When hospital staff reached out to respondent by

telephone to obtain consent to provide A.W.-B. with psychiatric medication, respondent refused and demanded that the hospital discharge A.W.-B. During that phone call, respondent claimed that A.W.-B. "needs the blood of Jesus Christ to heal," and the hospital records indicated that respondent was belligerent and combative. Respondent also denied during that phone call that A.W.-B. was experiencing suicidal ideation at the time of her admission.

¶ 68 A.W.-B. was diagnosed with major depressive disorder, conduct disorder, and chronic PTSD. Staff recommended that A.W.-B. participate in a hospitalization program at Hartgrove Hospital, but respondent declined and also refused to agree to any follow-up psychiatry appointments.

¶ 69 Psychotherapy progress notes from Children's Research Triangle, dated June 8, 2022, document respondent's belief that A.W.-B. was struggling with inappropriate touching of other children at school and that A.W.-B. had to be closely supervised due to this behavior and A.W.-B.'s persistent urge to masturbate. Respondent claimed that A.W.-B. needed to be homeschooled as a result.

¶ 70 However, notes from the same location dated October 5, 2022, document that respondent informed A.W.-B.'s school about A.W.-B.'s sexual behavior with other students. The school investigated and found no indication of safety concerns. Despite this, respondent insisted to the therapist her belief that A.W.-B. was engaging in inappropriate sexual behavior at school.

¶ 71 Whether the allegations of sexual assault and A.W.-B.'s own sexualized behavior are originating from A.W.-B. or being projected by respondent onto A.W.-B., as the trial court appeared to believe, or some combination of the two, the conclusion is the same. Respondent's actions have had a deleterious effect on A.W.-B. Rather than provide A.W.-B. with a sufficient

support structure to address the issues facing the two of them, respondent has repeatedly opted for a course of action that was invasive and traumatic and which left A.W.-B. isolated from friends, family, mental health treatment, and school. Additionally, we note that the adjudication hearing record was entirely silent as to further allegations of sexual assault since the trial court entered its temporary custody order on July 5, 2024, and removed A.W.-B. from respondent's custody through the time of the adjudication of wardship hearing.[5]

¶ 72    The sum of the evidence from the adjudication hearing persuades us that the trial court's neglect finding was not against the manifest weight of the evidence. While there is some dissonance between the trial court's conclusion that A.W.-B. was coached and its conclusion that respondent failed to protect A.W.-B. *if* the allegations were true, that does not diminish the reasonableness of the trial court's ruling with respect to respondent's actions or, in some cases, inaction.

¶ 73    The trial court found that A.W.-B. was neglected on the basis of a lack of care and because A.W.-B. was subjected to an environment injurious to her welfare. See 705 ILCS 405/2-3(1)(a), (b) (West 2024). Given the record and the considerable number of disquieting facts about this case, the opposite conclusion is not clearly warranted.

¶ 74    Because we hold that the trial court's neglect finding was not against the manifest weight of the evidence, we need not reach respondent's similar argument regarding the trial court's abuse

---

[5]The exhibits admitted at the disposition hearing indicate that respondent had a supervised visit with A. W-B. on July 26, 2024, in which DCFS staff repeatedly asked respondent to stop whispering to A. W-B. After that visit, A. W-B. stated she did not feel safe in her foster home and made allegations that she had been sexually assaulted by her foster parent. Respondent's visitation was suspended on July 30, 2024.

finding. We may affirm so long as any of the trial court's grounds for abuse or neglect may be upheld. *In re Faith B.*, 216 Ill. 2d 1, 14 (2005).

¶ 75 Accordingly, we affirm the trial court's judgment adjudicating A.W.-B. a ward of the court and its ultimate disposition that A.W.-B. should be placed in the guardianship of DCFS.

¶ 76                                    III. CONCLUSION

¶ 77 For the foregoing reasons, we affirm the judgment of the trial court.

¶ 78 Affirmed.

---

***In re A. W.-B.*, 2025 IL App (1st) 250617**

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit court of Cook County, No. 24-JA-476; the Hon. Lisa M. Taylor, Judge, presiding. |
| **Attorneys for Appellant:** | Sharone R. Mitchell Jr., Public Defender, of Chicago (Frank M. Adams, Assistant Public Defender, of counsel), for appellant. |
| **Attorneys for Appellee:** | Eileen O'Neill Burke, State's Attorney, of Chicago (John E. Nowak, Gina DiVito, and Marina C. Para, Assistant State's Attorneys, of counsel), for the People. |
| | Charles P. Golbert, Public Guardian, of Chicago (Kass A. Plain and Juliane Johnson, of counsel), for other appellee. |